Mary DOE et al., Plaintiffs,

v.

**GENERAL HOSPITAL OF the DISTRICT OF COLUMBIA et al.,
Defendants.**

Civ. A. No. 573-70.

United States District Court,
District of Columbia.

March 11, 1970.

Michael Nussbaum and Gilbert C. Miller, of Surrey, Karasik, Green & Hill, Washington, D. C.; and Caroline Nickerson, Washington, D. C., for plaintiffs; Ralph J. Temple, American Civil Liberties Union Fund of the National Capital Area, Washington, D. C., of counsel.

Charles T. Duncan, Corporation Counsel of the District of Columbia, John A. Earnest, John C. Salyer, III, and Edward L. Curry, Asst. Corporation Counsels, Washington, D. C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

WADDY, District Judge.

This class action was filed on February 26, 1970, seeking declaratory and injunctive relief. Plaintiffs allege that they seek to enjoin on behalf of plaintiff, Mary Doe, and others similarly situated the enforcement of the abortion policy of the General Hospital of the District of Columbia (hereinafter referred to as "D. C. General"), and to declare said policy unlawful.

This matter is before the Court on the motion of the plaintiff Mary Doe for a preliminary injunction. She alleged in her motion that she was seeking a preliminary injunction restraining defendants from denying her an abortion at the facilities of D. C. General "except insofar as said abortion is medically contra-indicated according to standards of medical practice generally applied by the hospital as to other forms of treatment." At trial her counsel conceded that she is seeking, by what in effect is a mandatory injunction, a free abortion on demand at D. C. General. Evidentiary hearing commenced on March 6, 1970, and was resumed and concluded on March 9, 1970.

Having considered the testimony presented, the affidavits and depositions on file, the memoranda submitted by counsel, and having heard closing argument by counsel for the plaintiff and counsel for defendants, the Court, pursuant to Rule 52(a), Federal Rules of Civil Procedure, makes the following findings of fact and conclusions of law:

### Findings of Fact

1. Plaintiff Mary Doe is a resident of the District of Columbia, and has been a continuous resident thereof for more than one year. She is 21 years of age and unmarried. Her taxable income is less than $2,400 per year. She meets the income and residence requirements necessary to receive free medical treatment at the facilities of the defendant General Hospital of the District of Columbia ("D. C. General Hospital").

2. The defendant D. C. General Hospital is an agency of the Government of the District of Columbia and is administered under the supervision of the Department of Public Health of the District of Columbia. It is the only government-owned Hospital within the District of Columbia furnishing comprehensive medical treatment to residents of the District of Columbia.

3. The defendant Walter E. Washington is the duly appointed, qualified and acting Commissioner of the District of Columbia.

4. The defendant Dr. Raymond L. Standard is the duly appointed, qualified and acting Director of Public Health in the District of Columbia, and is by law charged with administering the Department of Public Health under the authority delegated to him by the defendant Walter E. Washington.

5. The defendant Dr. John Nasou is the duly appointed, qualified and acting Director of D. C. General Hospital, and is by law charged with administering the Hospital.

6. The defendant Dr. Ernest Lowe is the duly appointed, qualified and acting Chief Medical Officer of the Obstetrics and Gynecology Department of D. C. General Hospital, and is charged with responsibility for administering that Department.

7. Each of the individual defendants is sued in his official capacity only.

8. On or about February 5, 1970, the plaintiff Mary Doe was informed by a competent and licensed physician within the District of Columbia that a pregnancy test showed her to be four to six weeks pregnant. She had attempted to prevent the pregnancy by the use of a contraceptive device which failed.

9. On February 17, 1970, plaintiff, Mary Doe, went to D. C. General and spoke with the defendant, Dr. Ernest Lowe. She told him that she was a resident of the District of Columbia, over 21 years of age and indigent; that she was single, pregnant and desired an abortion at D. C. General. Without giving Mary Doe any physical or mental examination whatsoever to determine whether she qualified for an abortion in accordance with the Hospital's rules and regulations, Dr. Lowe failed and refused to even consider her for an abortion; related to her the current practice at D. C. General concerning abortions, and refused to abort her.

10. The Department of Public Health and its director has the official responsibility for establishing the regulations and policies of D. C. General. There has never been any written delegation of that power with respect to the performance of therapeutic abortions. Over the years, however, the Chief Medical Officer of the Obstetrics and Gynecology Department, together with the Director of the hospital have promulgated rules and regulations which are known to the Director of Public Health and which have not been disapproved by him but, on the contrary, have been approved by his acquiescence therein. Such rules and regulations become a part of the official regulations of D. C. General.

11. D. C. General is accredited by the Joint Commission on Accreditation of Hospitals which, from time to time conducts a review of the hospital. On September 19, 1967, defendant, Nasou, by written memorandum reported to Dr. Murray Grant, who was then the Director of Public Health, that a representative of that Commission had informed the defendant, Nasou:

"* * * that the medical staff of each hospital must delineate a medical policy for itself concerning * * * therapeutic abortion, and that this policy should be part of the Rules and Regulations for the medical staff appended to the By-Laws. This must be consistent with and not more liberal than legislation and statutes of the jurisdiction, though the policy may be more stringent than the laws in effect."

Attached to the memorandum was a proposal dated July 18, 1967, which Dr. Nasou had received from the Division of Obstetrics and Gynecology at D. C. General stating the policy for therapeutic abortion at D. C. General. That policy was stated as follows:

"THERAPEUTIC ABORTION:

"A THERAPEUTIC ABORTION MAY BE DONE WHEN—

"A. THERE IS DOCUMENTED MEDICAL EVIDENCE THAT CONTINUANCE OF THE PREGNANCY MAY THREATEN THE HEALTH OR LIFE OF THE MOTHER;

"B. THERE IS DOCUMENTED MEDICAL EVIDENCE THAT THE INFANT MAY BE BORN WITH INCAPACITATING PHYSICAL DEFORMITY OR MENTAL DEFICIENCY;

"C. THERE IS DOCUMENTED MEDICAL EVIDENCE THAT CONTINUANCE OF A PREGNANCY, RESULTING FROM LEGALLY ESTABLISHED STATUTORY OR FORCIBLE RAPE OR INCEST MAY CONSTITUTE A THREAT TO THE MENTAL OR PHYSICAL HEALTH OF THE PATIENT;

"D. TWO OTHER PHYSICIANS CHOSEN BECAUSE OF THEIR RECOGNIZED PROFESSIONAL COMPETENCE HAVE EXAMINED THE PATIENT AND HAVE CONCURRED IN WRITING."

That policy was not disapproved by Dr. Grant and it became a part of the Rules and Regulations governing the medical Staff at D. C. General.

12. On or about September 8, 1969, the following statement of policy concerning therapeutic abortions was adopted by D. C. General and since that time it has been and is now a part of the official Rules and Regulations of the Department of Obstetrics and Gynecology:

"GENERAL: It is the policy of the staff of the District of Columbia General Hospital to provide the most efficacious treatment for women requiring therapeutic abortions. Such treatment will be carried out in accordance with the applicable laws of the United States and the D.C.Code.

"STATEMENT OF POLICY: Therapeutic abortions may be performed on a woman when:

"a. The patient is under some specific medical care in the Department of Public Health and

"b. The patient is evaluated by a staff obstetrician at the District of Columbia General Hospital who will perform the therapeutic abortion and

"c. The obstetrician doing the therapeutic abortion will have the patient evaluated by not less than two specific specialists covering the problem associated with the therapeutic abortion.

"d. There is documented medical evidence that continuance of the pregnancy may threaten the health or life of the mother or

"e. There is documented medical evidence that the infant may be born with incapacitating physical deformity or mental deficiency or

"f. There is documented medical evidence that continuance of a pregnancy, resulting from legally established statutory or forcible rape or incest, may constitute a threat to the mental or physical health of the patient.

"The examining physicians providing the specific examination of the patient in their speciality must have recognized professional competence in their speciality and subsequent to examination of the patient, these physicians will present their evaluation in writing and must concur in the provision of a therapeutic abortion for the woman under consideration."

13. The Rules and Regulations of September 8, 1969, governing therapeutic abortions at D. C. General are similar to those that prevail in the private hospitals in the District of Columbia that are accredited by the Joint Commission on Accreditation of Hospitals. The Court finds that the Rules and Regulations of September 8, 1969, are not arbitrary nor discriminatory and that they are relevant and reasonably appropriate for the sound management of the hospital. (Cf. City of Chicago v. Federal Power Commission, 128 U.S. App.D.C. 107, 115, 385 F.2d 629 (1967)).

14. Although the Rules and Regulations governing therapeutic abortions at D. C. General are similar to those prevailing in private hospitals in the District of Columbia, the practices under those Rules and Regulations differ. Except for a short period in the latter part of 1969 it has been the practice of D. C. General to refuse a woman a therapeutic abortion for reasons of mental health except in cases where there was a previous history of mental defects, even where a competent psychiatrist found that the woman's mental health was affected by the existence and continuance of the pregnancy. That practice was reinstated in January, 1970, and has remained in effect continuously since that time. On the other hand, certain of the private hospitals, including George Washington University, Columbia Hospital for Women, Washington Hospital Center and Sibley Memorial Hospital make their facilities available for the performance of therapeutic abortions under certain conditions. Typically, where a woman desires an abortion at

one of these hospitals the following procedure is followed:

(a) She consults an obstetrician with appropriate hospital privileges;

(b) The obstetrician determines that the abortion is medically safe;

(c) An appointment between the pregnant woman and one psychiatrist is arranged (two psychiatrists in the case of George Washington University Hospital);

(d) The psychiatrist, who in most cases has never before seen the woman, certifies that an abortion is necessary to preserve her "health";

(e) The appropriate hospital committee approves the use of its facilities;

(f) The abortion is performed by a qualified obstetrician in a safe clinical setting.

15. The psychiatric certification described in (c) and (d) above is not a bona fide medical procedure but is instead a medically insignificant ceremony imposed by the hospitals in the belief that it is required to avoid the possibility of criminal prosecution under District of Columbia law.

16. Title 22, Section 201 of the Code of Laws for the District of Columbia (1967 Edition) provides:

"Whoever, by means of any instrument, medicine, drug or other means whatever, procures or produces, or attempts to procure or produce an abortion or miscarriage on any woman, unless the same were done as necessary for the preservation of the mother's life or health and under the direction of a competent licensed practitioner of medicine, shall be imprisoned in the penitentiary not less than one year or not more than ten years; or if the death of the mother results therefrom the person procuring or producing, or attempting to procure or produce the abortion or miscarriage shall be guilty of second degree murder."

On November 10, 1969, Judge Gerhard Gesell of this Court in United States v. Vuitch, 305 F.Supp. 1032 (1969), a case involving the criminal prosecution of a physician for performing an abortion held the above-mentioned statute and particularly the phrase "as necessary for the preservation of the mother's life or health," to be unconstitutional when applied to a physician in that "it fails to give that certainty which due process of law considers essential in a criminal statute." [1] He also stated in his opinion that "His (the physician's) professional judgment made in good faith should not be challenged." (305 F.Supp. 1032, 1034). This decision of Judge Gesell triggered much discussion within the medical profession, and meetings were held by medical associations and hospital staffs, including a series at D. C. General. The meetings at D. C. General were held during December 1969. During the period that the meetings were being held D. C. General changed its practice and granted therapeutic abortions for mental reasons in cases where there was no previous history of mental defects. These abortions were granted upon a recommendation from a psychiatrist employed by one of the four public mental health clinics based upon a finding that the patient was suffering from a "reactive depression". In January, 1970, D. C. General ceased the practice it had followed in December, 1969, and reverted to its prior practice.

■ 17. This Court finds that neither the antiabortion statute, 22 D.C. Code, Section 201 (1967 Edition), nor the Rules and Regulations of D. C. General preclude D. C. General from making available its facilities for the performance of therapeutic abortions for mental health reasons whether or not the pa-

---

1. The government has appealed Judge Gesell's ruling and that appeal is now pending in the Supreme Court of the United States.

tient had a previous history of mental defects.

■ 18. The Court further finds that the Department of Public Health and D. C. General are required by law to provide comprehensive medical care for indigent residents of the District of Columbia, and that when such indigent resident applies to them for medical services they are under a duty to determine the patient's condition and to provide such service as may be medically indicated whether the patient's medical problem be physical or mental in nature.

■ 19. Inasmuch as defendant, Lowe, failed and refused to determine on February 17, 1970, when plaintiff, Mary Doe, applied for an abortion, whether said plaintiff was in fact pregnant and whether she qualified for an abortion upon either mental or physical grounds, he violated D. C. General's own validly promulgated Rules and Regulations and his actions were therefore arbitrary and capricious.

■ 20. There is a division of opinion in the medical profession whether abortions should be granted on demand. This Court finds that the determination as to whether an abortion should be performed involves a professional medical judgment by a physician and that judgment, when made in good faith, should not be challenged.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter.

2. Plaintiff, Mary Doe, has not established that she is entitled as a matter of law to a therapeutic abortion at D. C. General Hospital on demand.

■ 3. Plaintiff, Mary Doe, has established that she and those she represents are entitled upon their application to D. C. General for abortion to have their cases processed in accordance with the Rules and Regulations applicable to therapeutic abortions at D. C. General, and are further entitled to have administered to them such treatment as may

be medically indicated as a result of such processing, either from a physical or mental standpoint.

■ 4. Plaintiff, Mary Doe, and those she represents are entitled to injunctive relief restraining defendants from refusing the use of the hospital facilities at D. C. General for the performance by qualified physicians of therapeutic abortions on indigent residents of the District of Columbia who qualify in accordance with its Rules and Regulations for such abortions whether on physical or mental grounds.

## ORDER GRANTING PRELIMINARY INJUNCTION

Upon consideration of the foregoing Findings of Fact and Conclusions of Law, the evidence and the entire record herein, it is by the Court this 11th day of March, 1970,

ORDERED:

1. That the defendants and their successors in office, their agents, servants and employees and all in active concert or participation with them, be and they hereby are preliminarily restrained and enjoined from refusing to process plaintiff, Mary Doe, and those she represents for abortion in accordance with the Rules and Regulations applicable to same at D. C. General, and from refusing to administer to them at D. C. General such treatment as may be medically indicated as a result of such processing, either from a physical or mental standpoint.

2. That the defendants and their successors in office, their agents, servants and employees and all in active concert or participation with them, are preliminarily restrained and enjoined from refusing the use of the hospital facilities at D. C. General for the performance by qualified physicians of therapeutic abortions on indigent residents of the District of Columbia who qualify in accordance with its Rules and Regulations for such abortions, and where the physician certifies that such abortion is medically

indicated either on physical or mental grounds.

In view of the nature of the case and the indigency of the plaintiff bond is set in the amount of $1.00.