**Mary DOE et al., Appellants,**

v.

**GENERAL HOSPITAL OF the DISTRICT OF COLUMBIA et al.,**
**Appellees.**
**No. 24011.**

United States Court of Appeals, District of Columbia Circuit.

May 15, 1970.

Mr. Michael Nussbaum, with whom Miss Caroline Nickerson, Washington, D. C., was on the motion for appellants.

Messrs. Charles T. Duncan, Corporation Counsel, Hubert B. Pair, Principal Asst. Corporation Counsel, and Richard W. Barton, and David P. Sutton, Asst. Corporation Counsel, for appellees.

Before BAZELON, Chief Judge, McGOWAN and MacKINNON, Circuit Judges, in chambers.

BAZELON, Chief Judge:

This is a motion to hold respondents, various persons connected with the administration of D.C. General Hospital,[1] in civil contempt. At an earlier stage of this litigation, the district court granted preliminary injunctive relief to the class of indigent women resident in the District of Columbia who seek therapeutic abortions at D.C. General Hospital.[2] Respondents were ordered simply to comply with the hospital's own regulations concerning the grounds for performing such operations; and specifically, to end the practice of limiting abortions performed to protect the woman's mental health to those patients who could establish a history of mental illness predating the pregnancy.[3] The day after the district court issued its preliminary injunction, we denied petitioners' motion for summary reversal. Because the papers filed by the parties indicated some confusion regarding the scope of the preliminary injunction, we sought in our order denying summary reversal to state our understanding of what it required.

1. The motion names Dr. Raymond L. Standard, Director of Public Health for the District of Columbia; Dr. John P. Nasou, Director of the General Hospital of the District of Columbia; and Dr. Ernest Lowe, Chief Medical Officer of the department of obstetrics and gynecology of the General Hospital of the District of Columbia. These three officials, together with The Honorable Walter Washington, Commissioner of the District of Columbia, and the General Hospital of the District of Columbia, are the defendants in the underlying class action to which this contempt motion is an ancillary proceeding. The hospital is an agency of the government of the District of Columbia, administered by the Department of Public Health, and charged with the responsibility of providing medical care to indigent residents of the District of Columbia. *See* Calomeris v. District of Columbia, 96 U.S.App.D.C. 364, 226 F.2d 266 (1955).

2. The underlying suit was filed by "Mary Doe," a 21-year-old then-pregnant woman who satisfies the income and residence requirements for free medical care at D.C. General Hospital; Dr. Michael A. Jackson, an obstetrician and gynecologist who has patients eligible for free medical care at D.C. General Hospital; Dr. E. James Lieberman, a psychiatrist who has patients eligible for free medical care at

D.C. General Hospital; Washington Women's Liberation, the Metropolitan Chapter of the Medical Committee for Human Rights, and the National Association for Repeal of Abortion Laws, three unincorporated associations engaged in activities related to improving the availability of abortions to all women, without regard to economic considerations. "Mary Doe" was permitted by order of this court to proceed anonymously and to testify in camera; she brought the suit in her own behalf and as the representative of the class of pregnant women who seek abortions and are entitled to medical care at D.C. General Hospital. Another member of the class was subsequently permitted to intervene as a named plaintiff, proceeding anonymously as "Jane Roe." The instant motion has been filed by a third member of the class, seeking leave to proceed anonymously as "Mary Doe II."

3. 313 F.Supp. 1170 (D.D.C., March 11, 1970). The complaint seeks declaratory and permanent injunctive relief compelling D.C. General Hospital to provide therapeutic abortions to indigent women in accordance with the regulations of the hospital and the standards generally applicable to patients who can afford to pay for medical care in private hospitals in the District of Columbia.

Thereafter, one of the original named plaintiffs sought and was denied a therapeutic abortion at the hospital under the terms of the preliminary injunction. Petitioners sought to have us hold respondents in civil contempt. We entertained the motion because of the emergency nature of the matter at that time,[4] but denied the motion because the relief of civil contempt was inappropriate, inasmuch as Mary Doe had received the relief she sought from another source. We noted also that the hospital's action was within an interpretation of the terms of the two outstanding judicial orders which, although clearly wrong, was barely plausible as a first attempt on the part of the hospital administrators to accommodate hospital practices to the requirements of the preliminary injunction. In light of that misunderstanding, however, and with a purpose to avoid further claims of contempt of the preliminary injunction, we accompanied our order with an opinion setting forth, this time in some detail, precisely what compliance with the district court's preliminary injunction appeared in our view to entail.[5]

A second contempt motion demands closer scrutiny, for it calls into question not only the specific denial of treatment to the named petitioner, but also the general practice of the hospital with respect to the members of the class she represents. The facts set forth in the uncontroverted affidavits filed in support of the instant motion are simple. "Mary Doe II" is fourteen years old and eight to eleven weeks pregnant. Her father is an unemployed alcoholic; her mother, who supports Mary and four other children, works as a charwoman in two jobs and earns less than $100 a week. Mrs. Molly Doe, Mary's mother, herself became pregnant for the first time at the age of fourteen. She bore the child, but hopes for a better future for her daughter. Mrs. Doe sought advice from a more affluent and better educated neighbor, who telephoned D.C. General on Mary's behalf. The neighbor was told by Dr. Ward, one of the four staff physicians in the department of obstetrics and gynecology, that abortions on mental health grounds were available only to persons with a prior history of psychiatric treatment.

The chief of obstetrics at D.C. General Hospital testified that the proper response to such a telephone inquiry would be to refer the patient to a public mental health clinic to find out whether there are present mental health indications for a therapeutic abortion.[6] Dr. Ward, however, made no such referral. He stated that Mary's age was a "social" rather than a "psychiatric" ground for abortion, and consequently she could not obtain a therapeutic abortion without charge at D.C. General Hospital, although she could probably obtain the abortion for a fee at a private hospital.[7] When the neighbor argued that the Doe family could not afford a private abortion, Dr. Ward told her to "inform the family that it would cost less money to have the abortion now than it would cost to have a baby." On the basis of these facts, petitioners ask us to hold the responsible city and hospital officials

---

4. Mary Doe and Jane Roe were each approaching the end of the first trimester of pregnancy, after which abortion may require more complicated procedures or involve greater risk to the pregnant women. *See* Transcript, March 9, 1970, at 82–85. To avoid the consequences of further delay, Mary Doe arranged to procure an abortion outside of D. C. General Hospital; Jane Roe, however, remained dependent on emergency relief from this court.

5. 140 U.S.App.D.C. ——, 434 F.2d 423 (1970).

6. Deposition of Dr. Ernest Lowe, March 3, 1970, at 18.

7. The uncontroverted affidavit of a staff physician at one of the city's area mental health centers states that Dr. Ward has in the past performed at least one abortion in a private hospital for a fee on a patient who was denied a therapeutic abortion at D. C. General Hospital.

in civil contempt, and to afford appropriate supplementary relief.[8]

## I

Respondents do not deny that Dr. Ward's action was in violation of the hospital regulations which they have been enjoined to follow. They assert, however, that Dr. Ward acted under a good-faith misunderstanding of the scope of the injunction, and that in any event petitioners' claim is not ripe because Mary Doe II failed to appear in person at the hospital to request an abortion.

◼ We need not pause long over the latter contention. A telephone inquiry is a reasonable and common way of approaching the hospital to request treatment.[9] Dr. Ward's response gave no indication that further steps would be helpful in Miss Doe's attempt to obtain an abortion. Even now respondents do not suggest that she would have received a more favorable response in person than on the telephone. It would be a cruel and empty formality to require any patient seeking an abortion to present herself at the hospital for certain rejection.[10]

◼ The motion for civil contempt does not turn on the question whether Dr. Ward acted in good faith. Its purpose is not to punish intentional misconduct, but rather to enforce compliance with an order of the court and to remedy any harm inflicted on one party by the other party's failure to comply.[11] Even though the district court's preliminary injunction affords only temporary relief and may eventually be superseded, nevertheless until it expires it is an order of the court creating important legal rights.[12] If petitioners have been deprived of those rights, then the role of the court on a motion to hold respondents in civil contempt is not to fix blame but to ascertain how the violation occurred, how to prevent a recurrence, and how to repair any damage that has been done.

## II

◼ The primary basis for this contempt motion is the preliminary injunction issued by the district court. We need not decide whether, as petitioners allege, the challenged conduct violates orders of this court as well; and whether, in any event, we have jurisdiction to reach the merits of the instant motion.[13] For we deem it appropriate in the present circumstances to defer in the first

8. Petitioners ask the court to order Dr. Standard, Dr. Nasou, and Dr. Lowe to furnish written assurance under oath that they will comply with the orders of this court and the district court. Petitioners also seek an order requiring respondents (1) to process Mary Doe II immediately in accordance with the court orders, (2) to report periodically to counsel on the number and disposition of requests for abortions received at D. C. General Hospital, and (3) to place prominent advertisements in the three daily newspapers reproducing the appendix to the March 20 opinion of this court and making it clear that the hospital will consider all eligible women for treatment under the standards therein described.

9. See Deposition of Dr. Lowe, at 17–20.

10. This court has recently had occasion to deplore in another context a public hospital's practice of requiring patients to exhaust meaningless procedural steps before turning to the courts for relief. See Dixon v. Jacobs, 319 U.S.App.D.C. 138, 427 F.2d 589 (1970). Government counsel would discharge its duty best not by shielding official misconduct from judicial scrutiny but rather by advising the public agency of the extent of its legal obligations.

11. McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949).

12. United States v. United Mine Workers of America, 330 U.S. 258, 293–295, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

13. See United States v. Barnett, 376 U.S. 681, 692, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964); Land v. Dollar, 89 U.S.App.D.C. 38, 56–57, 190 F.2d 623, 641–642 (1951), vacated as moot, Sawyer v. Dollar, 344 U.S. 806, 73 S.Ct. 7, 97 L.Ed. 628 (1952).

instance to the trial court's power to protect the integrity of its own order.[14] That court presently has before it the merits of the litigation; and furthermore, a full evidentiary hearing will be necessary to fashion adequate safeguards to prevent recurrent violations of its injunction. Obviously, the district court is far better equipped than we to hold a hearing to resolve possibly controverted issues of fact. We therefore remand the case to the district court to consider the issue of compliance with its preliminary injunction.

We believe, however, that in light of the tortured course of this litigation, and the repeated instances of administrative confusion or worse, sound judicial practice, as well as fairness, make it highly desirable for us to discuss several issues which will be faced on remand. This discussion will assist the trial court and the parties in facilitating the proceedings on remand, so that indigent patients and their volunteer counsel will not have to shuttle back and forth between courts and have their cases handled in piecemeal fashion.[15]

█ A. *What measures have been taken by city and hospital officials to assure that the injunction is obeyed?* Respondents assert that Dr. Ward did not know the court orders related to any patients other than the two plaintiffs named in the suit. We find it surprising, to say the least, that any of the four staff physicians assigned to the hospital's department of obstetrics and gynecology could fail to understand the general applicability of either his hospital's regulations or the highly publicized findings by the District Court with respect to the nature of those reg-

ulations.[16] But it will be up to the trial court to determine whether this episode should be treated as the isolated mistake of a single doctor, or whether that mistake calls into question the responsibility of the city and hospital officials charged with the administration of the hospital. The mayor, the public health department, the hospital administration, and the department of obstetrics and gynecology all have an obligation to ensure that medical care is provided for the indigent residents of the District of Columbia in an even-handed manner and in conformity with the law. It may be that they also have some responsibility for the events that provide the basis for this motion. After exploring the lines of communication among them, and ascertaining the steps they have taken or could take to comply with its injunction, the trial court should be able to fashion relief adequate to protect the rights of petitioners from erosion by any bureaucratic act of omission or commission.

█ B. *To what extent is compliance with the injunction prevented or hindered by inadequate resources?* Respondents represent that an abortion will be promptly available to Mary Doe II "[i]f, upon making the appropriate investigations, it is determined that a therapeutic abortion is legally and medically justified, and *if there are available sufficient hospital facilities and resources.*" [Emphasis added.] They represent further that the hospital physicians will comply with the outstanding court orders "within the limits of the Hospital's facilities and resources." The suggestion that inadequate resources may prevent compliance should be fully·

---

14. Respondents' assurance that Mary Doe II will receive prompt treatment relieves this court of the necessity for affording immediate relief. But in light of the past conduct of the public health authorities, and their expressed doubts about their ability to comply in the future, it is necessary for the trial court to consider how to ensure that all members of petitioner's class are treated in accordance with the terms of the injunction.

15. *See* Dixon v. Jacobs, 138 U.S.App. D.C. at 324, 427 F.2d at 594, *cf.* Nader v. General Motors Corp., 25 N.Y.2d 560, 566–567, 255 N.E.2d 765, 769–770, 307 N.Y.S.2d 647, 653 (1970).

16. It has been reported that the hospital has "not yet set up our policy to go through with the court order." Washington Post, April 30, 1970, at 1, col. 7.

explored in the trial court. It would seem that many women who fail to obtain therapeutic abortions will nevertheless call on the hospital for care that imposes an equivalent burden on hospital resources, in connection either with incomplete abortions attempted outside the hospital, or with childbirth.[17] In order to evaluate the claim of inadequate resources, it will be necessary to determine accurately the number of abortion requests received by the hospital, and the number of beds and physicians available for that purpose.[18] The record suggests that of the four physicians in D.C. General's department of obstetrics and gynecology, two are unavailable to perform abortions because of religious scruples, and one is reluctant to perform abortions because of philosophical reservations.[19] If the trial court finds that the department of obstetrics and gynecology lacks an adequate number of physicians who are available to perform abortions, it will be necessary to determine whether the city administration and health authorities have considered the possibility of making other hospital physicians available or permitting private physicians to perform abortions in the hospital.

Even if the city's or hospital's resources are seriously overburdened, the court cannot for that reason refuse to inquire into an allegation of illegal conduct. The hospital may be unable to fulfill its obligation to provide medical care to indigents without affirmative action by the legislative or the executive branch, appropriating or reallocating funds for the purpose. But that is no reason for the court to refrain from declaring that the obligation exists even though persons beyond the reach of the court prevent its discharge.[20]

■ C. *What harm has resulted from respondents' failure to ensure compliance with the preliminary injunction, and what is the appropriate remedy for any such harm?* The district court's injunction was designed to protect the rights of the class of indigent women seeking abortions during the pendency of this litigation. The failure of city and hospital officials to ensure compliance may already have deprived many indigent women of the legal abortions under medical supervision to which they were entitled, and deterred many others from asserting their rights under the injunction. If the trial court so finds, it should consider whether affirmative action should be required of respondents in order to inform the members of the affected class of the grounds on which they are entitled to a therapeutic abortion at the hospital without charge.[21]

---

17. The record suggests that it is a common practice in the District of Columbia for non-medical abortionists to perform an incomplete abortion and then advise the woman to go directly to D.C. General Hospital for completion of the abortion. The cost to the hospital of that procedure is at least as great as the cost of performing a therapeutic abortion; simple care is in general more costly to the hospital than a therapeutic abortion. Depo-prenatal care, delivery, and post-partum sition of Dr. Lowe, at 43–45.

18. It appears that although D.C. General Hospital receives more than ten requests each day, it continues to perform only about seven abortions a month, in contrast to the private hospitals in Washington which perform at least 400 abortions a month at fees of about $600 each.

Deposition of Dr. Lowe, at 19–20, 59; Transcript, March 6, 1970, at 45; Washington Post, May 1, 1970, at B2, col. 5.

19. Transcript, March 9, 1970, at 62–64.

20. Willis v. Department of Conservation and Economic Development, 55 N.J. 534, 264 A.2d 34 (April 20, 1970).

21. *See* Fed.R.Civ.P. 23(d) (2), authorizing the court in a class action to require such notice as may be necessary to protect the members of the class. New York City hospital officials have stated that when their state's new liberal abortion statute takes effect they will take steps to "make the availability of this service widely known among the women of New York City." N. Y. Times, April 30, 1970, at 1, col. 1.

### III

Our primary concern is not the good faith of the city and hospital officials, but the deprivation of medical care suffered by indigent patients.[22] This class action asserts the rights of people who have been overwhelmed by poverty, wretched medical care, unemployment, inadequate education, substandard housing, and a cluster of poverty-related problems.[23] If every poor person must bring a lawsuit each time her rights are infringed either by the insensitivity or by the ignorance of city and hospital officials, all will be effectively deprived of those rights. There are limits to the ability of the most able volunteer counsel to maintain the state of alert watchfulness—and the caseload—that would be necessary to protect against wrongs on such a scale. The events that form the basis of the instant motion have come to the attention of the court only through a series of fortuitous events. Mary Doe II happened to turn to a neighbor for help; the neighbor happened to be sufficiently well-informed not only to call D.C. General Hospital for information, but also to recognize the fact that the hospital's response was inconsistent with the outstanding injunction; and she reported the incident to the attorney in this case. But the district court's injunction is in terms applicable not only to Mary Doe II but to all members of the class she represents. Respondents have an obligation to ensure that the injunction against them is complied with, not only for Mary Doe II, but for all women who come within its terms.

Remanded for further proceedings in accordance with this opinion.

### MacKINNON, Circuit Judge:

I concur in remanding the case to the District Court for hearing and reiterate my position that mental health involvement is a legal basis for abortion under the D.C. General Hospital Regulations and D.C.Code § 22–201 and that hospital practices must recognize this. However, while judges of the Court of Appeals and the lawyers involved may be fully aware of the status and meaning of the court's decisions in the District of Columbia, I am unwilling to presume that Dr. Ward was similarly knowledgeable about the legal technicalities involved. Doctors live in an entirely different world far removed from the field of lawyers and they are not ordinarily familiar with the ins and outs of litigation. I find Dr. Ward's lack of familiarity with class actions to be not unusual in lay personnel. They are a relatively unusual form of legal action.

A cardinal point for me in this case is that, as I read the affidavits, Lee Davis, the neighbor who called about the possibility for an abortion for Mary Doe II did not contend that Mary Doe II was suffering from any mental disease, the affidavit of Mary Doe's mother did not so contend, and no such claim is made here now. Thus, as I read the moving papers, movants are advancing the claim that *every person* who contacts D.C. General Hospital about an abortion must be informed and processed to see if there is not some possible way that an abortion could be justified on mental health grounds, whether such claim is advanced for the patient or not. That seems to me to be beating the mental health grounds to death and to be extremely unreasonable. I surmise it would also be extremely costly and that the time of psychiatrists could more appropriately be devoted to cases where their services appear to be needed. I do not believe that mental disease is the only ground or that mental health grounds are presumed to exist in every abortion request, and I do not believe that the hospital should be held in contempt because they fail to process every case on mental health grounds. To do so, is to overemphasize mental health grounds and this may not assist the

22. *See* Dixon v. Jacobs, 138 U.S.App. D.C. at 331, 427 F.2d at 601.

23. For a survey of the problems, see, *e. g.*, Report of the National Advisory Commission on Civil Disorders (1968), *passim.*

patient. The case of Mary Doe II seems to be a case in point. Actually counsel for Mary Doe II, in attempting to support her case on questionable mental health grounds since no such grounds were previously claimed, have overlooked the obvious fact that Mary Doe II is 14 years of age and clearly entitled to an abortion under the hospital regulations which authorize same "In cases of confirmed rape. * * *" (D.C. General Hospital Regulations of January 27, 1970, see Mary Doe v. General Hospital, 140 U.S.App.D.C. ——, ——, 434 F.2d 423, 427 (1970). In the District of Columbia any carnal knowledge of a female child under sixteen years of age is *rape* and punishable by imprisonment for not more than thirty years, and the jury may add "with the death penalty," D.C. Code §§ 22–2801. A child of such tender years is considered incapable of consenting and the pregnancy confirms the rape. Hence, she had a clear right to an abortion under the hospital regulations.

I do not find it any more unusual for Dr. Ward to not be entirely familiar with the intricacies of the *Mary Doe* decision than to find Mary Doe's attorneys unfamiliar with the D.C.Code and hospital regulations on rape, even though the hospital regulations were set out *in extenso* in the *Mary Doe I* decision where the present lawyers for Mary Doe II were counsel. People, including doctors and lawyers do many times make, what may appear to others to be, obvious mistakes.

There is one further argument advanced in appellant's brief that I feel necessitates comment. Appellants contend, in effect, that Doctor Ward intentionally refused to process Mary Doe II on mental health grounds and suggest this may have been on grounds of "philosophy." The brief then states:

"Surely, if any attorney informed the Court that he refused to accept an assigned criminal case because of his 'philosophy' or because of other immaterial reasons, the attorney would be subject to discipline. Dr. Ward has done the same thing."

Rejecting the other immaterial (?) reasons as not being in point here, so far as "philosophy" is concerned, if that includes having his conscience or morals being personally revolted by the assignment, I do not agree that any lawyer or doctor would be subject to any discipline by any person for refusal to accept a professional assignment with such involvements. I consider that any doctor would have a perfect right and an obligation to refuse to perform an abortion on what he personally considered to be specious mental health grounds, just as any lawyer could refuse to accept the defense of a criminal case that might personally be revolting to him or require him, for example, to aid or support by his conduct or silence a specious or untruthful defense. We have not yet, I hope, reached the point where lawyers and doctors are automatons of the state.

Concluding, I agree that the case should be remanded because the Court of Appeals is ill suited to act as a trial court, but I see no merit to the claim of contempt since Mary Doe II is not alleged to be within the class of persons suffering from mental disease and it would be extremely unreasonable to require *every* abortion request to be processed by the hospital on mental health grounds.