GREATER WASHINGTON D. C. AREA COUNCIL OF SENIOR CITIZENS et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA GOVERNMENT et al., Defendants.

Civ. A. No. 275–71.

United States District Court, District of Columbia.

Sept. 11, 1975.

Joseph N. Onek, Margaret A. Kohn, Center for Law and Social Policy, Washington, D. C., for plaintiffs.

Edward L. Curry, Asst. Corp. Counsel, Washington, D. C., for defendants.

## MEMORANDUM OPINION

PARKER, District Judge.

This proceeding is concerned with one aspect of the failure of the District of Columbia Government to deliver adequate health services to its residents. The plaintiffs are two local senior citizens organizations and several area residents. They seek declaratory and injunctive relief alleging that inadequate treatment and facilities are afforded at the principal City-operated health and medical facility—The District of Columbia General Hospital (D.C. General). The defendants are the Mayor of the District of Columbia; the Director of the District of Columbia Department of Human Resources (DHR); and the Director of the Community Health and Hospital Administration and part-time acting Executive Director of D.C. General. The Department of Human Resources is charged with the delivery of health services for the City and D.C. General is a component within the Department of Human Resources.

On January 29, 1971, when this complaint was filed, this Court had jurisdiction under 11 D.C.Code § 521 (1967 ed.) which provided that the United States District Court for the District of Columbia had original jurisdiction of all civil

matters in which one of the parties was a resident of the District of Columbia. On February 1, 1971, the District of Columbia Reorganization Act went into effect, but the District Court retained jurisdiction of civil matters filed before the effective date. 11 D.C.Code § 501(1). Thus, since this action was begun before February 1, 1971,[1] this Court continues to have jurisdiction.

The matter was heard at a full and complete hearing held on July 23, 24, 28 and 29, 1975. At that time the Court received the testimony of plaintiffs' witnesses,[2] who were thoroughly familiar with conditions at the facility by reason of their present or past working experience at D.C. General. The defendants offered only the testimony of the Director of DHR and the acting Executive Director of the hospital.

The testimony and evidence presented focused on only eight areas of services at D.C. General: medical records, the radiology department, emergency room, nursing department, pharmacy, infection control, laboratory and general maintenance. On the basis of the record the Court concludes that in those areas, the mission of the defendants to provide adequate services has failed; that the facilities fall far short of recognized and acceptable standards in this community; that relief is long overdue and that the defendants should be enjoined to under-' take appropriate corrective action.

In reaching this decision the Court has considered not only the testimony of the witnesses, but also voluminous documentary evidence submitted by the parties. Plaintiffs submitted statistical data concerning the staffing levels of D.C. General compared with other hospitals in the area, including Cafritz Memorial Hospital, Georgetown University Hospital, George Washington University Medical Center and the Washington Hospital Center.[3] This comparative staffing study was compiled by one of the attorneys for plaintiffs, who is not qualified as an expert in either statistics or hospital staffing and administration. For that reason, the Court did not rely on that study in making its factual determinations. Plaintiffs have also submitted various reports and studies by governmental agencies which have been more helpful to the Court. These include the DHR's own evaluation of the staffing situation at D.C. General, contained in the Health and Medical Care Administration's 1972 Task Force Report (HMCA Report).[4] More recent studies of D.C. General include a survey conducted under the auspices of the Department of Health, Education and Welfare completed November 1, 1974 (HEW Report),[5] and a June 1975 research report authored by the Municipal Research Bureau, Inc.[6] The Court also considered certain in-hospital documents, including minutes of committee and department meetings,[7] memoranda, letters and minutes concerning problems in the renal dialysis unit,[8] and documentation concerning deficiencies in the Hospital's Infection Control Program.[9]

---

1. Even if the suit were deemed to have begun as of the date of the latest amendment of the complaint, June 7, 1971, this Court would still have jurisdiction pursuant to 11 D.C.Code § 501(4), which gives the U.S. District Court jurisdiction of civil suits filed within 30 months of February 1, 1971, where the amount in controversy exceeds $50,000. In this case, the relief requested by plaintiffs clearly exceeds $50,000 in value.

2. The parties stipulated that plaintiffs' witnesses were experts in nursing and various aspects of medicine, medical administration and public health.

3. Appendices I to V attached to plaintiffs' Pretrial Memorandum, filed December 17, 1972.

4. Part A of Appendix VII attached to plaintiffs' Pretrial Memorandum, filed December 17, 1972.

5. Appendix B attached to plaintiffs' Pre-Hearing Memorandum filed July 14, 1975.

6. Appendix D attached to plaintiffs' Pre-Hearing Memorandum filed July 14, 1975.

7. Appendix VII attached to plaintiffs' Pretrial Memorandum filed December 17, 1972.

8. Admitted in connection with the testimony of Dr. Diamond.

9. Admitted in connection with the testimony of Dr. Cardella.

Defendants also submitted certain post-hearing documents at the request of the Court, including a proposal by a private firm for a management control survey study of D.C. General, summaries of corrective measures taken by the DHR in the areas of procurement and supply, personnel and maintenance, a report on the number of vacancies on the nursing staff, a memorandum from the Mayor's Office concerning exemption of D.C. General from a recent hiring freeze, and a plan of corrective action to remedy the deficiencies found in the November 1974 HEW survey.[10]

### Defendants' Duty to Provide Adequate Medical Care

■■ Defendants' legal duty to provide D.C. General Hospital patients with comprehensive medical care in accordance with accepted medical standards in the community is clearly mandated. Organization Order No. 141[11] directs the Hospital to provide "comprehensive hospital care and treatment including inpatient services, outpatient services and emergency room treatment." Only recently in a case involving medical standards at D.C. General, Judge Waddy of this Court wrote that "D.C. General [is] required by law to provide comprehensive medical care for indigent residents of the District of Columbia."[12] This duty to provide adequate care "is measured by the degree of care, skill and diligence customarily exercised by hospitals generally in the community."[13] Nor does the argument that the failure to carry out this obligation may stem from budgetary or political restraints preclude this Court's concern and action. Our Court of Appeals clearly rejected that reasoning in a case involving D.C. General's duty to provide abortions to its indigent patients:

> Even if the city's or hospital's resources are seriously overburdened, the court cannot for that reason refuse to inquire into an allegation of illegal conduct. The hospital may be unable to fulfill its obligation to provide medical care for indigents without affirmative action by the legislative or executive branch, appropriating or reallocating funds for that purpose. But that is no reason for the court to refrain from declaring that the obligation exists even though persons beyond the reach of the court prevent its discharge.[14]

The record developed in this proceeding clearly shows that services and facilities at D.C. General, especially with regard to medical records, the radiology department, emergency room, nursing department, pharmacy, infection control, laboratory, and general maintenance are so deficient as to make it impossible to provide an acceptable level of health and medical care. The Court's factual findings with regard to each of these problem areas will be discussed in turn.[15]

### Medical Records

The critical shortage of personnel in the Medical Records Department and the problems stemming from it were noted as early as 1972. At that time an HMCA Task Force Report documented an annual misplacement rate for medical

---

10. Attachments to July 31, 1975 letter from Joseph P. Yeldell, Director of the Department of Human Resources, to Honorable Barrington D. Parker, filed under seal August 5, 1975. (Hereafter Yeldell submission).

11. Appendix 1, D.C.Code, p. 215 (1973 ed.).

12. *Doe v. General Hospital of the District of Columbia*, 313 F.Supp. 1170, 1175 (D.D.C. 1970).

13. *Alden v. Providence Hospital*, 127 U.S.App. D.C. 214, 382 F.2d 163, 166 (1967), quoting *Garfield Memorial Hospital v. Marshall*, 92 U.S.App.D.C. 234, 204 F.2d 721, 725 (1953).

14. *Doe v. General Hospital of the District of Columbia*, 140 U.S.App.D.C. 149, 434 F.2d 427, 433 (1970).

15. The Court's findings are primarily based upon the testimony heard on July 23, 24 and 28, 1975. Transcript references are included for the testimony of defendants Yeldell and Standard because these are the only transcripts available in the record. Unless otherwise indicated, factual conclusions were drawn from the remaining untranscribed testimony.

charts of 150–200 and transcription backlogs extending to 1966.[16] The HEW Survey also found that patient records were not being completed within 15 days following discharge, in violation of federal regulations.[17] The recent testimony before the Court demonstrated not only that the problem still remains but that only feeble efforts, if any, have been initiated to remedy the situation. The Hospital concedes that the situation cannot be improved until vacancies are filled in the Medical Records Department.[18]

The gravity of the records situation has generated a more serious problem in that it has frustrated the efforts of the medical staff to render in a reasonable time an appropriate diagnosis and treatment of patients. The evidence showed that at least one department resorted to setting up its own record system, thus duplicating tasks which should be performed by the Medical Records staff. The supervisor of the acute inpatient renal dialysis unit[19] testified that his unit maintained its own records because of the inadequacies of the regular medical records system. He felt this step was justified because without up-to-date and complete records, any therapy plan devised would entail the risk of unnecessary repetition of tests or treatment procedures. The chief of Georgetown University Medical School's Cardiology Department at D.C. General, testified that in his opinion the medical records are unsatisfactory because the information is not organized in one place. The head of the out-patient clinic stated that inadequate records make it necessary for some out-patients to make two trips to the hospital in order for the physician to make a proper determination of what medication the patient had been receiving and what should be prescribed.

The acting Executive Director of D.C. General, conceded that the maintenance of medical records was a critical problem, but was of the opinion that the problem could be solved by reducing the patient population from 650 to 500 and redistributing the staff.

*Radiology Department*

The Radiology Department is understaffed in clerical, technical and nursing assistant positions. The Director of Radiology Services who has occupied that position since 1971, testified that the shortage of x-ray technicians has necessitated an increase in overtime work. This in turn has lowered the quality of the work performed by fatigued technicians.[20] A shortage of nursing assistants has resulted in delays in transporting patients to and from other areas of the hospital for purposes of securing x-rays. Insufficiency of clerical workers has prevented physicians from obtaining x-ray reports and films promptly.[21] Staff shortages have directly resulted in a 5–10% repetition of x-ray examinations due to lost or imperfect films.

Compounding the staff shortage problem, the volume of radiology services provided over the last four years has increased while the number of staff performing those services has decreased. Between 1971 and 1975, the annual number of diagnostic and therapeutic examinations increased from 131,566 to 150,352 per year. During the same period, the number of x-ray technicians was reduced from 20 to 18, nursing assistants dropped

**16.** HMCA Report, *supra* n. 4, pp. 80, 81 and 84.

**17.** 20 C.F.R. § 405.1026(e)(2) and (j)(2) (must be complied with to qualify for federal Medicare benefits).

**18.** HEW Report, *supra* n. 5, p. 20.

**19.** Renal dialysis is a lifesaving procedure for total kidney failure which requires the patient to undergo lengthy treatment sessions on the dialysis machine up to three times per week. Testimony of Dr. Diamond, July 23, 1975.

**20.** D.C. General spent $27,939 for overtime work by x-ray technicians during the first six months of 1975. Affidavit of Dr. Tracy Walton (July 28, 1975).

**21.** $29,942 was spent for overtime clerical work in Radiology during the first six months of 1975. *Id.*

from 4 to 3, and the number of clerical workers decreased from 10 to 4.[22]

Along with the understaffing issue was an equally serious problem regarding the maintenance of x-ray machinery. The testimony showed that on occasions as many as four of the 13 x-ray machines have been in disrepair for periods of several weeks. Machines remain inoperative from one to six weeks. There is a total absence of a preventive maintenance program for the x-ray equipment, which could at least have eliminated most of the major breakdowns. D.C. General's management requires that in-house maintenance personnel must be summoned before the manufacturer's repair crew can be requested, even though the in-house personnel have rarely been able to repair the complicated machines.

The deficiencies in the Radiology Department have been made known to defendants since 1972, at least. The HMCA Task Force Report noted that evening, night and weekend coverage was completely inadequate, film retakes were necessary 25% of the time and clerical assistance was insufficient.[23] Memoranda to the Executive Director of the Hospital on March 20, 1972 and October 15, 1973, concerning the adverse effects on patient care of the staff shortages in Radiology are a part of the record.[24] These memoranda resulted in no corrective action.

The problems of the Radiology Department have been obviously long-standing and the hospital administration, while aware of them, is unable to point to any significant improvements or to offer any meaningful corrective measures. At the July hearing one of the DHR defendants testified that plans were under way to contract for preventive maintenance for all hospital equipment, including the x-ray machines, but no details were given

on the planned contract. It was acknowledged that there was an insufficient number of clerical help in the Radiology Department, but again no immediate hope of improvement was offered.

*Emergency Room*

Adequate physician staffing, as required by this Court's Order of September 27, 1971, has been maintained to date.[25] The Emergency Room presently has insufficient support staff, however, to provide the necessary observation of patients who may be suicidal, subject to seizure, or dangerous to themselves or others due to drug-induced disorientation. This situation has contributed to the death of several patients, according to the present head of the Emergency Room and the Out-Patient Clinic.

The Radiology Department has insufficient staff to provide a radiologist or radiology resident on duty for consultation in the Emergency Room after 8 P.M. weekdays and during weekends and holidays. D.C. General's Emergency Room is the only major hospital emergency room which does not have the full-time services of a radiologist or radiology resident. The consequence is that physicians in the Emergency Room with no special training in radiology, must read x-ray films themselves during those periods when no radiology expert is available. Untrained physicians are likely to be unable to recognize poor quality x-ray films, which should be retaken, and may be unable to recognize medical abnormalities in films of acceptable quality which in turn cause incorrect diagnoses and delayed delivery of proper treatment to patients.

*Nursing Department*

It was generally acknowledged that there is currently a nursing shortage at D.C. General. According to the Hospi-

22. *Id.*
23. HMCA Report, *supra* n. 4, pp. 25–26, 28–29.
24. Attachment # 2 to Affidavit of Walton, *supra* n. 20.
25. Testimony of Dr. Eliza J. Taylor, head of the Emergency Room and out-patient clinic, July 23, 1975.

tal's own records, there were 48 RN vacancies and 100 total nursing vacancies in November 1974.[26] As of July 31, 1975, there were 54 total nursing vacancies.[27]

Registered nurses assigned to non-surgical inpatient units typically spend 80–90% of their time in preparation and distribution of medications. As a result, nurses are unable to perform such other important nursing functions as patient education, patient observation, and ordinarily expected patient care to speed recovery and prevent complications arising from hospitalization. The impact of the nursing shortage is particularly serious for patients transferred from the intensive care unit to the regular ward who still need special nursing care. Incomplete charting of physiological and other vital signs [28] impairs the ability of physicians at D.C. General to properly diagnose and treat patients. A shortage of specially trained nursing staff in the renal dialysis unit has prevented patients from receiving adequate care and occasionally, physicians had to perform a dialysis, a time-consuming procedure which would ordinarily have been done by a nurse.

*Pharmacy*

Shortages of drugs which are frequently prescribed are common occurrences at D.C. General. When drugs are not on hand, the nurse must call other nursing units to ascertain whether they have the required medication and to arrange with a physician for substitution if the drug is unavailable anywhere in the Hospital. In an effort to alleviate this problem, the daily purchase order authority for drugs was recently increased from $250 to $500,[29] a relaxation of an existing cumbersome procedure.

D.C. General plans to implement the "unit dose system" for distributing medication, but has not yet done so due to a lack of staff. The unit dose system would mean that the central pharmacist sends pre-measured doses to each unit of the Hospital, thus saving nursing time now spent pouring out doses and stocking medicine cabinets.[30]

*General Maintenance*

There is no effective preventive maintenance program for major equipment utilized in the Hospital's operations.[31] Problems caused by inordinate delays in repair of necessary equipment were noted in the HMCA Task Force Report.[32] Reference has been made, *supra*, to the breakdown of x-ray machines. Similar problems have developed with respect to electrical equipment required for the treatment and diagnosis of heart patients. Malfunctioning of that equipment has been a frequent occurrence and has presented a serious threat to patient health according to the chief of the Georgetown Cardiology Department at D.C. General.

In addition to poor maintenance of medical equipment, there have also been serious inadequacies in general building maintenance. A nursing supervisor testified that a fallen ceiling necessitated the closing of a ward within recent months. A physician recounted that a leaking roof in his department remained unchecked for weeks. Major damage to the corner of a main hospital building, caused by a city bus in September 1973, remained unrepaired in July 1975.[33] The

26. HEW Report, *supra* n. 5, p. 13.

27. Yeldell submission, *supra* n. 10.

28. Several extreme cases of insufficient charting were noted in the HEW Report, *supra* n. 5, p. 16.

29. Testimony of Yeldell, Transcript, July 28, 1975, at p. 27 (hereafter Yeldell Testimony).

30. See HMCA Report, *supra* n. 4, p. 4 and p. 52.

31. Mr. Yeldell testified that there are plans to implement a preventive maintenance program at D.C. General. Yeldell Testimony, p. 18.

32. HMCA Report, *supra* n. 4, p. 52 and p. 6.

33. Noted in HEW Report, *supra* n. 4, p. 4, Mr. Yeldell confirmed the fact that the damage remains unrepaired, because "the situation is under litigation." Yeldell Testimony, p. 19.

HEW Survey concluded that the overall building maintenance left the safety of patients and visitors in doubt.[34]

The director of DHR testified that an improvement in this area is anticipated by the designation of a maintenance crew under the Hospital's sole control. This contrasts with an earlier procedure where required maintenance work was requisitioned directly through the Department.[35] In addition, a supplemental DHR budget request of 12.4 million dollars is pending before the Congress, which is earmarked to correct deficiencies of the physical plant.[36]

### Infection Control

The Hospital lacks an effective infection control program, as reflected in the 1974 HEW Report,[37] and the D.C. licensure survey team in 1973 and 1974.[38] An infection control program, required by the Hospital by-laws and the Joint Commission on the Accreditation of Hospitals, is intended to reduce the transmission of infections among patients and staff. The Chairman of the Hospital's Infection Control Committee from June 1973 to May 1975, testified that according to accepted medical practice, a specialized infection control practitioner or epidemiologist is necessary for an effective infection control program. D.C. General does not currently have such a person on its staff,[39] and the program that it does have is plagued by staff shortages within those departments of the Hospital, with which the program should be coordinated.

### Laboratory

D.C. General's laboratory does not have sufficient staff to satisfactorily perform its functions. Physicians often doubt the reliability of a single test result, and to resolve such doubts multiple specimens from the same patient are frequently submitted in order to reduce the chances of relying on erroneous test results. Transportation of specimens to and from the laboratory is thwarted by a lack of staff. As a result, interns, residents and medical officers, substituting as messengers, routinely transport specimens themselves in order to assure prompt testing. The Infectious Disease Department, in order to receive necessary lab results within a reasonably short time, uses its own physicians, medical students, nurses and lab technicians to pick up specimens and deliver results. The head of the Infectious Disease Department felt this was justified because the regular Hospital messenger system was too slow and inefficient.

### The Defendants' Position

The defendants have for the most part acknowledged the deficiencies at the Hospital but counter with the argument that adequate care cannot always be provided because of budgetary constraints.[40] They explained in their testimony that the newly instituted "zero-base budget process" is designed to provide a realistic assessment of the costs of providing different levels of service at the Hospital and should help meet the current problems. Like all other local government agencies, D.C. General had previously used a line item approach, which merely requested increments for various items already budgeted in the prior year. Thus, under the new budget method, professionals in the Hospital have made determinations of the equipment and staff that would be needed to provide an adequate level of care for patients at D.C. General.

The present capacity of D.C. General is 700 beds.[41] During the past fiscal

---

34. HEW Report, *supra* n. 5, p. 4.

35. Yeldell Testimony, pp. 17–18 and 72.

36. *Id.* at 15–16.

37. HEW Report, *supra* n. 5, p. 7.

38. Plaintiffs' exhibits 4 and 5, identified by Dr. Cardella, July 28, 1975.

39. HEW Report, *supra* n. 5, p. 7.

40. *See* "Opposition of Defendants to Motion of Plaintiffs for Summary Judgment," filed October 16, 1974.

41. Dr. Standard explained that the present capacity of D.C. General is 700, but that only

year, $31 million was expended for D.C. General. The proposed FY 1976 budget for the Hospital is $34.5 million. This will be sufficient to maintain D.C. General as a 500 bed hospital with sub-specialty clinics at a level of care defendants regard as satisfactory, given current outpatient and Emergency Room volume. Using the zero-base budget method, defendants have estimated that it would cost $37 million to maintain a 600 bed hospital next year, and $41 million to maintain D.C. General as a 700 bed hospital for the same period.[42]

Defendants assert that if they receive the $34.5 million requested for D.C. General, the staffing problem will be solved if the Hospital can reduce its patient capacity from 700 to 500;[43] that there are sufficient acute care beds in the Washington area to absorb D.C. General's excess patients; and that some chronic care patients could also be moved out of D.C. General if and when more extended care facilities are available. There is no assurance, however, that the number of patients can be reduced in the near future in order to alleviate the understaffing problems.[44]

The budgetary problems of the District Government as a whole have resulted in hiring freezes which have aggravated D.C. General's staffing problems. The Hospital received a special exemption from a recent District-wide freeze imposed July 17, 1975 which extends through December 31, 1975. It is noted that during past hiring freezes, employees were required to work overtime even though vacant positions could not be filled. The wisdom of this approach is suspect for the hiring of new personnel would have been less expensive than paying existing staff to work overtime.[45]

*Conclusion*

The overwhelming and, indeed, the uncontroverted evidence compels the conclusion that in the several areas where testimony and evidence have been submitted, the treatment and care of patients and the facilities at D.C. General fall well below any acceptable level of quality and efficiency and that the defendants have failed to provide adequate medical care and service to patients in accordance with recognized standards of medical practice in this community.

In reviewing the facts presented, the Court has carefully noted the efforts of the defendants to resolve the vexing problems which plague the Hospital. Their efforts have not been successful. Their excuse that the conditions are a product of fiscal constraints is unacceptable absent a clear demonstration that even within those constraints, timely and positive efforts have been launched by exacting, sensitive and demanding administrators. These ingredients appear to be lacking. Meanwhile, lurking in the background is the possibility of the loss of accredited status by the Hospital.

The function of the Court at this juncture is to point out the obligations of the defendants and to make certain that they discharge their responsibilities as required under the law.[46] It does not perceive its role, at least at this time, to prescribe what course of action is mandated. But the Court will require the defendants to develop specific remedial actions and proposals, subject to a schedule of review to ensure that all proposed steps are carried out within a given time reference.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) F.R.Civ.P., and on

85% of the beds are occupied on the average. Testimony of Dr. Raymond Standard, Transcript, July 28, 1975 at 8–9 (Standard Testimony).

42. Standard Testimony at 38–45; and Yeldell Testimony at 31–34.

43. Standard Testimony, pp. 37–38.

44. Yeldell Testimony, p. 34.

45. Id., p. 52, Yeldell submission, *supra* n. 10.

46. This function is not limited by defendants' budgetary concerns. *See: Doe v. General Hospital of the District of Columbia*, 140 U.S. App.D.C. 149, 434 F.2d 427, 433 (1970); and *Wyatt v. Aderholt*, 503 F.2d 1305, 1315 (5th Cir. 1974).

the basis thereof it is this 11th day of September, 1975

Declared that defendants have failed to meet their legal obligation to provide adequate care to patients at D.C. General Hospital in accordance with the standards of accepted medical practice in the community; and it is further

Ordered that the defendants shall submit to the Court by November 17th, 1975 a detailed plan of corrective action regarding staffing, equipment, supplies, repairs and any other problems at D.C. General Hospital in the areas covered by the Memorandum Opinion: medical records, radiology, emergency room, nursing, pharmacy, infection control, laboratory and general maintenance; and it is further

Ordered that defendants shall take immediate steps to fill all budgeted positions now vacant at D.C. General Hospital in the departments and areas listed above and shall file by October 15th, 1975 a detailed report indicating the actions so taken; and it is further

Ordered that defendants shall develop and submit to the Court by November 17th, 1975 a report detailing the number and cost of additional staff at D.C. General Hospital or alternatively, the reduction in patient load required to assure that D.C. General meets the standards of accepted medical practice in the community, along with an implementation plan detailing the measures defendants intend to take, or have taken, to increase staff or reduce patient load; and it is further

Ordered that defendants shall forthwith file with the Court the complete zero-base budget analysis for each division of D.C. General Hospital for Fiscal Year 1976; and it is further

Ordered that all reports filed by the defendants with the Court pursuant to this Order shall be made available to counsel for plaintiffs on the date filed; and it is further

Ordered that plaintiffs shall file their comments, if any, on all of the defendants' reports and submissions within 20 days thereafter.

The Court shall retain jurisdiction of this matter.