Renaldo L. SPIVEY et al., Plaintiffs,

v.

Marion BARRY et al., Defendants.

Civ. A. No. 80–1300.

United States District Court,
District of Columbia.

Nov. 17, 1980.

Laura W. S. Macklin, Community Legal Services, Inc, Maureen Ward, Marilyn Mohrman—Gillis, Steptoe & Johnson, Patrick F. J. Macrory, Chris R. Ottenweller, Arnold & Porter Washington, D. C., for plaintiffs.

Johnny M. Howard, Asst. Corp. Counsel for the District of Columbia, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

AUBREY E. ROBINSON, Jr., District Judge.

On May 23, 1980, Plaintiffs filed the instant action, alleging that the closing of the

Northwest Health Center (the Upshur Street Clinic or Clinic) violated their constitutional rights to due process and equal protection; their rights to health care pursuant to the District of Columbia Clinical Health Services Act of 1977, D.C.Code § 32–322 (Supp. V 1978); their procedural rights as afforded by the District of Columbia Advisory Neighborhood Commissions Act of 1975, *as amended*, D.C.Code § 1–171i (Supp. V 1978) (ANC Act); and their procedural and substantive rights as guaranteed by the District of Columbia Administrative Procedure Act, D.C.Code §§ 1–1501 to 1510 (Supp. V 1978) (D.C.APA).

Plaintiffs Renaldo and William Spivey and Iva Johnson, who sued individually and on behalf of all others similarly situated, are District of Columbia residents who live near Upshur Street Clinic, are unable to afford medical care, and received services at the Clinic prior to its closing on May 20. Mrs. Johnson received care for arthritis, hypertension, and an overweight condition. William Spivey received care for high blood pressure, migraine headaches, heat exhaustion, infections and colds. Renaldo Spivey received annual check–ups from a cardiac specialist to confirm the safety of his participation in school sports, check–ups necessitated by a heart condition.

Plaintiff–intervenor Louline Green, whose claims are also representative of those of Plaintiff class members, has been receiving regular care and treatment at the Clinic for diabetes and high blood pressure, and cannot afford to pay for care.

Plaintiff Judy Murray, a certified physician assistant and a District of Columbia resident, sued in her individual capacity. She had submitted comments opposing the Upshur Street Clinic closing in response to the April 18, 1980 *D.C. Register* notice.

Plaintiffs' Complaint was filed on May 23, 1980, their Amended Complaint was filed on May 28, 1980.

On May 28, 1980, the Court granted Plaintiffs' motion for class certification. The class was defined as follows:

> [A]ll District of Columbia residents who need, but who are unable to pay for, clinical health services, including but not limited to the health services specified in the District of Columbia Clinical Health Services Act of 1977.

The matter was tried to the Court on July 3, 7 and 8, 1980.

Defendants are the District of Columbia, Mayor Marion Barry, DHS Director James Buford, Public Health Commissioner Rosalyn Epps, Ambulatory Health Care Administrator William Washington, and TB Control Chief Hazel Swann.

## I. THE CLOSING OF THE UPSHUR STREET CLINIC AND ITS IMPACT ON THE MEDICALLY INDIGENT

1. The District of Columbia has operated public health clinics for a number of years; the Upshur Street Clinic has been open since the 1950's.

2. The District has enacted laws and developed policies expanding the scope of public health care and ensuring its availability to the medically indigent. *See* District of Columbia Regulations, Chapter H–7, Article H–710, §§ H–7110–7111. In 1968 the Health Department established neighborhood health centers as "the crux" of a system for furnishing clinical care throughout the District. These centers are essential components of the public health care delivery system, and primarily serve the medically indigent.

3. The medically indigent are those persons who are unable to afford adequate medical care and lack third party coverage such as Blue Cross and Blue Shield.

4. The Upshur Street Clinic was, prior to its closing on May 20, 1980, in Defendants' terms "the largest and busiest neighborhood health center in the City . . . . [I]t served as an indispensable component of the City's public health delivery system [and] fulfilled the goal of the District to provide available and accessible community–based health service to District residents . . . of all ages, domiciled primarily in the northwest quadrant of Washington."

5. The Clinic was run primarily by the Ambulatory Health Care Administration

(AHCA) of the Department of Human Services. The mission of the Ambulatory Health Care Administration, set forth in Organization Order No. 25 and consonant with its responsibilities under Reorganization Plan No. 2, is

> "to assure equitable access by all District citizens to an effective level of comprehensive outpatient health care services."

The Upshur Street Clinic played, by the District's own admission, an "integral" role in this AHCA–administered system of outpatient health care services.

6. Prior to its closing, the Clinic was located at 1325 Upshur Street, N.W., Washington, D.C., in a large five–level brick building with approximately 25,000 square feet of useable space. The clinic had approximately four waiting rooms, ten examining rooms, six nurses' offices, and a pharmacy and laboratory under AHCA auspices; additional space and facilities at the Clinic were devoted to venereal disease and tuberculosis clinical services administered by the Preventive Health Services Administration (PHSA). Two x–ray machines and one EKG machine were available at the Clinic.

7. Prior to its closing the Upshur Street Clinic was the only public medical facility in the Northwest sector which offered general medicine, obstetrics/gynecology, and pediatrics on a full–time basis.

8. The Clinic also offered specialist services in cardiology sixteen hours a week, in podiatry twenty–four hours a week, in dermatology eight hours a week, in adolescent medicine four hours a week, and in athletic screening sixteen hours a week.

9. In addition to the general medicine and specialty services listed above, the Upshur Street Clinic also housed separate venereal disease and tuberculosis screening and treatment clinics, which further expanded the range of services available. The venereal disease and tuberculosis clinics were each available on a full–time basis. X–rays were available for the diagnosis and treatment of general medical and other problems under the auspices of the tuberculosis clinic.

10. The clinic also had a pharmacy, which dispensed approximately 80,000 prescriptions per year. Prescriptions and medications were furnished free of charge to the medically indigent.

11. A separate laboratory facility at the Clinic, staffed by health screening and laboratory technicians, collected samples pursuant to doctors' instructions and forwarded the samples to an outside laboratory where tests and analyses were performed.

12. Because it provided a complete range of primary care, commonly needed secondary care, and related ancillary services, Upshur Street was a "comprehensive" clinic.

13. Prior to its closing, Upshur Street Clinic (excluding its venereal disease and tuberculosis units) had fifteen doctors, comprised of two pediatricians, two obstetrician/gynecologists, seven physicians in general medicine, one cardiologist, two dermatologists, one athletic specialist, and one adolescent specialist.

14. Described in terms of full–time equivalents (FTE), the Clinic had the following staffing pattern in calendar year 1979: 2 FTE pediatricians, 2 FTE obstetrician/gynecologists, 4.2 FTE physicians in general medicine, .8 FTE cardiologists, .2 FTE dermatologists, and .5 FTE specialists in athletic and adolescent medicine, for a total of 9.7 FTE physicians.

15. In FY 1979 Upshur Street Clinic reported 75,753 patient visits, more visits than any D.C. public health clinic facility with the exception of the D.C. General Hospital outpatient department. At a rate of 75,753 patient visits in FY 1979, Upshur Street had six times as many patient visits as Walker–Jones, the next largest Northwest clinic, and three times as many visits as Walker–Jones and the other five Northwest clinics combined. Excluding the Upshur Street Clinic patient visits for tuberculosis and venereal disease services, Upshur Street Clinic had 48,625 patient visits for FY 1979, four times as many visits as Walker–Jones and well over twice as many visited Walker–Jones as the other five Northwest clinics combined.

16. The majority of patients who used the Upshur Street Clinic lived near the clinic. A DHS report on the utilization of the neighborhood clinics by child health patients in FY 1977 identifies users of the Upshur Street Clinic by census tract. According to the census tract map and the summary of this study prepared by Plaintiff, 90.7% of the child health patients served by Upshur Street Clinic came from census tracts in Northwest Washington, and 60.7% lived within a one and one–half mile radius of the Clinic.

17. A one–week survey of users of the Upshur Street Clinic, conducted by DHS in October, 1979, confirms that most of the users of the Upshur Street Clinic are residents of Northwest Washington. Of the 643 patients surveyed, 335, or 52%, stated that the public or private health facility closest to their residence was Upshur Street Clinic. An additional 199, or 31%, of the 643 patients surveyed responded that Howard University Hospital or Upper Cardozo Clinic (operated by Community Group Health Foundation, Inc.) were the closest facilities. Since Howard University and Upper Cardozo are both in Northwest and within one and one–half miles of Upshur Street Clinic, the survey indicates that approximately 81% of the Upshur Street Clinic patients live in neighborhoods near the Clinic. It further indicates that approximately 573 of the 643, or 89% of the clinic patients surveyed live in Northwest Washington neighborhoods.

18. A 1978 DHS and Georgetown University sponsored study in which a random sample of Upshur patients were surveyed (hereinafter the Harris study) indicates that more than 75% of the patients surveyed traveled less than one–half hour to get to the Clinic. A large proportion walked or came by bus.

19. Similar findings of residential proximity were made in a 1976 DHR task force subcommittee report which found that

"An average of 92.6% of patients who attend all of these (HDR–run, neighborhood health) clinics come from the Service Area in which the clinic is located or an immediately adjacent Service Area."

20. The Court finds that a sizeable majority of Upshur Street Clinic patients live in the Northwest neighborhoods near the Clinic.

21. Several of the Northwest neighborhoods served by the Upshur Street Clinic, particularly Service Area 7, have a high percentage of persons living in poverty, and high rates of infant mortality and serious communicable diseases.

22. The Upshur Street Clinic was the principal source of health care for medically indigent residents of Northwest Washington, D.C. The District of Columbia was not able to provide the Court with an estimate of the number of medically indigent patients who were served by Upshur Street Clinic prior to its closing, because it has not systematically compiled records from which even the approximate number of medically indigent Upshur Street patients could be ascertained. At trial witnesses for both Plaintiffs and Defendants acknowledged that Upshur Street Clinic had been an important source of services for medically indigent patients.

23. The 1978 Harris study revealed that approximately 37% of Upshur Street patients were "self–pay" (i. e., did not list third–party coverage) and an additional 30% of the patients were of unknown pay status. A substantial percentage of "self–pay" patients are medically indigent. Willie Mae Watkins, for example, a former Upshur Street patient, testified that she was billed, couldn't afford to pay the bills, but was still given care and treatment.

24. The Court finds that a substantial but undetermined number of former Upshur Street patients are medically indigent. The Court further finds that as a public health clinic, Upshur Street was a major source of care for medically indigent persons.

II. *IMPORTANCE OF COMPREHENSIVE CARE AND GEOGRAPHIC ACCESSABILITY*

25. The Upshur Street Clinic was a "comprehensive" health clinic that was geo-

graphically accessible to a substantial number of medically indigent people. According to recognized standards of community health care, as presented to the Court during trial, the availability of comprehensive services in geographically accessible locations is vital to the delivery of adequate public health care to medically indigent persons.

26. The availability of a broad range of necessary and related medical services at geographically accessible locations increases the likelihood that patients will use the facility, both for preventive and remedial care.

27. The availability of this range of services at one location also increases the likelihood that patients can and will obtain follow–up tests (i. e., x–rays), examinations (i. e., by specialists), and medications.

28. Upshur Street Clinic had the highest utilization rate of all D.C. public health clinics with the exception of the D.C. General Hospital outpatient department. This high utilization rate was due in large part to the fact it offered geographically accessible comprehensive services.

29. Defendants publicly acknowledged the importance of providing comprehensive services in geographically accessible locations and reducing fragmentation in its 1976 task force report on outpatient health delivery in D.C. The members of the task force specifically recognized that the provision of more fully comprehensive health clinics would maximize both patient utilization and the effectiveness of public health care delivery.

30. This recognition of the importance of comprehensive services in providing adequate public health care has been incorporated into the Department's own definition of its public health responsibilities. Reorganization Plan No. 2, approved by the D.C. Council Human Resources Committee on February 16, 1980, requires the Ambulatory Health Care Administration to "[p]romote a high–quality and cost effective system which emphasize[s] coordinated and comprehensive care to the patient." Organization Order No. 25 similarly states that the mission of AHCA is "to assure equitable access by all District citizens to an effective level of comprehensive outpatient health care services."

31. The availability of comprehensive health services in geographically accessible locations is particularly important in assuring adequate care for the elderly, the disabled, and those who must rely on public transportation. In this respect, the range of services provided at Upshur Street was necessary to adequate patient care.

32. By Defendants' own admission in their 1980 State Health Plan, primary and secondary health care services must be within thirty minutes of the patient's residence by public transportation to be geographically accessible.

33. Upshur Street Clinic was geographically accessible to a large number of its patients, according to the generally accepted thirty minute travel time standard. In a telephone survey performed for the Harris study, more than 75% of the Clinic patients reported that it took them less than thirty minutes to reach the Clinic.

34. Many elderly persons with low incomes live near Upshur Street and relied on the Clinic. According to the Harris study, for example, 19.7% of Upshur Street patients were age 60 or over, and another 38.6% were between the ages of 45 and 59.

35. Many of the older Upshur Street patients suffer from arthritis, often in conjunction with another chronic disease such as diabetes or hypertension. For these patients, travel to two or more locations to obtain care and treatment imposes serious hardships and barriers to receiving adequate care.

36. Many Upshur Street patients have to rely on public transportation. According to the Harris study of "self–pay" patients using Upshur Street Clinic, 40.7% took the bus to the clinic, 22.2% walked, 18.5% got a ride from a friend or relative, and only 14.8% drove there in their own car.

37. When the necessary range of services is not available at a geographically

accessible location, indigent persons are likely to receive inadequate medical care. Without the availability of comprehensive clinical care, many indigent patients:

    a. do not receive adequate preventive care, and therefore encounter complications and require more costly care later;

    b. must utilize hospital emergency rooms for care, which is expensive; and

    c. only receive care in a sporadic and fragmented manner, and do not receive care with the necessary continuity and coordination between various doctors, providers, and services.

Each of these problems has been posed by the closing of Upshur Street.

38. The Upshur Street Clinic served as a referral resource or back–up facility for DHS doctors providing services in the smaller Northwest clinics. For example, numerous patients were referred from Adams–Morgan, R Street, Claridge, Regency, and Garfield clinic to Upshur Street for x–rays, and for appointments with specialists, such as the cardiologist.

39. Medically indigent patients from the small, community–sponsored clinics in Northwest (such as Zacchaeus, and Washington Free Clinic) were referred to Upshur Street for services such as x–rays. The closure of Upshur Street Clinic leaves a gap in back–up care and health services for smaller DHS clinics and community–sponsored clinics which serve the medically needy.

40. Now, medically indigent patients needing x–rays must be referred to D.C. General, and those needing cardiology are referred to either D.C. General or to the Southwest Neighborhood Health Center.

### III. THE CLINIC CLOSING CREATED A GAP IN CLINICAL HEALTH CARE FOR THE MEDICALLY INDIGENT

#### A. Staff and Space Shortages

41. The Defendants contend that DHS simply "relocated" staff and services formerly available at Upshur Street. In fact, however, many staff were transferred to clinic locations no longer accessible to Upshur Street patients. Four full–time doctors, three part–time doctors, and three part–time podiatrists from Upshur Street Clinic were transferred to clinics outside the Northwest sector. The remaining Northwest clinics, which are geographically accessible to former Upshur Street patients, do not have adequate staff to absorb the Upshur Street patient load.

42. In 1979 Upshur Street Clinic was serving approximately 11,200 patient visits in general medicine per year with 4.2 FTE physicians. The remaining Northwest clinics were serving approximately 6,500 visits per year with 1.5 FTE. Now the remaining clinics will have the responsibility for an additional 11,200 visits per year, but with only 1.5 of the 4.2 FTE physicians formerly serving that caseload. It is impossible for the remaining clinics to absorb this volume of visits with such limited staffing. The director of two of the Northwest geriatric clinics testified that since the Upshur Street closing his caseload has nearly doubled, to the point where he can no longer give the adequate service that he believes his patients should be getting.

43. The physician staff shortages in the remaining Northwest clinics are similar with respect to pediatric visits. In 1979 Upshur Street served approximately 8,200 patient visits with 2 FTE pediatricians, and the remaining Northwest clinics served approximately 8,200 visits with 4.7 FTE pediatricians. Now the remaining clinics will have the responsibility for approximately 8,100 additional visits per year, but with only .8 of the 2.0 FTE pediatricians formerly serving that caseload.

44. In obstetrics/gynecology the problems are similar. In 1979 Upshur Street served 4,300 patient visits with two full–time physicians. The remaining Northwest clinics served approximately 3,000 visits with 2.2 FTE physicians. Now the remaining clinics will be responsible for approximately 4,300 additional patient visits per year, but with only .8 of the 2.0 FTE physicians formerly responsible for that caseload.

45. The capability of each of the remaining Northwest clinics to absorb Upshur Street patient visits is further limited by support staff and space shortages. At most of the remaining clinics, physicians must draw and prepare all of their patients' blood samples, a time–consuming task previously performed by lab personnel at Upshur Street.

46. More time is wasted because some of the physicians assigned to the remaining Northwest clinics do not have sufficient examining room space. One obstetrician/gynecologist, for example, who has only one room for an office, examining room and laboratory, must often wait in the hallway while each patient dresses and undresses. The closing of Upshur Street Clinic, which had ten examining rooms, and the prospective removal of Walker–Jones Clinic, which had seven examining rooms, leaves only ten examining rooms in all the remaining public health clinics in the Northwest sector. This reflects a sixty-three percent reduction in public health physicians' examining room space.

47. The existing staff shortages will be exacerbated at the close of FY 1980, on September 30, 1980, when the Defendants carry out plans to eliminate an additional ninety–one public health positions in the Ambulatory Health Care Administration. Memoranda prepared several months ago indicate that eleven doctors, ten nurses, and two nursing assistants will be terminated from positions in clinics throughout the City. To date, Defendants have been unable to provide Plaintiffs and this Court with detailed information about the extent to which each of the remaining clinics will lose staff.

48. In their earlier report on the "Impact of Proposed Reductions [for] FY 81" Defendants admitted that these staff reductions would decrease the quantity of services provided. This document projected that the closure of the Northwest Health Center and the concomitant staff reductions would "result in the following approximate reductions in services provided by the Department of Human Resources: pediatrics–8,100 [visits]; gynecology–1,160; maternity _____;* family planning–1,530; general medicine–11,200; podiatry–2,700; specialty clinics services–18,300; and school athletic physical exams–620." There is no showing that these reductions are supported by reductions in the population served by public health clinics.

49. The Court finds that substantial numbers of medically indigent patients residing in the Northwest neighborhoods will be denied adequate medical care because of the Defendants' actions in closing Upshur Street Clinic and transferring and terminating staff.

### B. *Inadequate Services at Remaining Clinics*

50. No public clinic in the Northwest sector now offers comprehensive health care. Garfield, Regency, and Claridge Towers clinics are extremely small, primarily geriatric clinics. Neither R Street nor Adams Morgan is a comprehensive clinic. Walker–Jones offers only pediatrics and obstetrics/gynecology.

51. Few of the existing Northwest clinics offer even their basic services full time. None offer obstetrics/gynecology or general medicine on a daily basis, only two, R Street and Walker–Jones offer pediatric services under DHS auspices on a daily basis, and none offer x–ray or pharmaceutical services. Moreover, R Street Clinic, which purports to offer care for elderly patients and patients with heart problems, does not even have EKG equipment.

52. This fragmentation of care–both in scope and hours of available services–necessitates trips by patients to several locations for the care received at Upshur Street. Moreover, patients now receiving their basic care at one of the remaining Northwest clinics must travel to D.C. General Hospital for x–rays and to the Spring Road, N.W. or H Street, N.E. facilities for their prescriptions.

* The document is illegible.

53. Fragmented service, when coupled with the need of many patients to rely on public transportation, has extremely deleterious effects on the ability of patients to secure adequate health care. Some patients are unwilling or unable to go to D.C. General Hospital for needed x–rays because of its inaccessibility. Patients who do manage to get to D.C. General experience up to four hour waits for the required services. Some patients simply do not or cannot travel to Spring Road or H Street, N.E. for medication and therefore go without needed prescriptions, frustrating their course of treatment.

54. The Court finds that substantial numbers of medically indigent patients who live in Northwest neighborhoods are now being denied adequate medical care because none of the remaining public clinics in Northwest offers the necessary range of primary and secondary care and ancillary services, particularly pharmacy and x–ray, formerly available at the Upshur Street Clinic.

### C. Geographic Inaccessibility of Other Public Health Facilities

55. Other public health clinics and D.C. General Hospital outpatient department clinics are not adequate sources of medical care for medically indigent Upshur Street Clinic patients. The public health clinics located outside the Northwest sector are geographically inaccessible to medically indigent patients who used Upshur Street. The non–Northwest clinics are all more than thirty minutes away from the Upshur Street area, an unacceptable distance by District and public health standards.

56. D.C. General Hospital is geographically inaccessible to Northwest residents and is overcrowded, necessitating extraordinary waits for service.

### D. Financial Inaccessibility of Private Health Facilities

57. Private medical facilities are not available to former Upshur Street patients who are medically indigent. While private hospitals can absorb patients with Medicaid or Medicare coverage and those with other sources of reimbursement or private resources, they cannot and do not absorb significant numbers of those unable to pay.

58. Upper Cardozo Clinic's budget and financial constraints restrict its ability to absorb additional patients who are unable to pay for medical care. Although Upper Cardozo Clinic has some procedures for providing free care to medically indigent patients, the Clinic cannot and will not absorb these indigent patients in significant numbers without additional funding from either the federal government or the District government. Upper Cardozo Clinic is already receiving federal grants each year to cover a large percentage of its operating costs, and it is unlikely that additional federal funds will be made available. Moreover, Upper Cardozo has not received any monies or funding commitments from the District government to provide care to the medically indigent and no such commitments are forthcoming.

59. The Upper Cardozo Clinic budget for FY 1979–80 provides reduced fees for approximately 4,600 patient visits (of a total 24,000 projected patient visits), but does not provide for any care for persons unable to afford the twenty–five percent charge which is the lowest reduced fee arrangement budgeted.

60. Assuming more funding were to become available for Upper Cardozo Clinic, the Clinic's capability to absorb substantial numbers of additional patients from Upshur Street is limited by space constraints. Upper Cardozo Clinic leased a large portion of its space to the District's venereal disease clinic (formerly housed at Upshur Street). As a result, Upper Cardozo's Medical Director predicted that there would probably be no more room for expansion for two years.

61. The closure of Upshur Street Clinic and the clinical staff reductions have resulted and continue to result in the denial of adequate clinical health care to medically indigent persons who live in the Northwest neighborhoods near the clinic.

IV. *THE DECISION TO CLOSE THE UPSHUR STREET CLINIC WAS ARBITRARY, CAPRICIOUS, AND OTHERWISE NOT IN ACCORDANCE WITH THE LAW*

A. *Failure to Consider Responsibility to Medically Indigent*

■ 62. District of Columbia health planning officials have repeatedly recognized the need for a comprehensive clinical health facility in the Northwest area served by the Upshur Street Clinic prior to its closure. A January, 1978 DHS proposal for capital improvements funding explains:

> NWHC [Northwest Health Center] is the largest and busiest neighborhood health center in the city. As such it serves as an indispensable component of the city's public health delivery system.
>
> It fulfills the goal of the District to provide available and accessible community–based health services to District residents.

In 1979, the D.C. State Health Planning and Development Agency reviewed the foregoing proposal for Upshur Street Clinic funding and determined, *inter alia* :

a. that the Clinic facility is "an integral part of the health system of the District of Columbia";

b. that other health services provided by the community would be considered inadequate for the area residents, in the absence of the Upshur Street Clinic; and

c. that if a comprehensive clinic is not maintained at Upshur Street, residents would face "extreme accessibility difficulties" in trying to obtain services "outside of their immediate community".

63. Nevertheless, the Defendants decided to close the Upshur Street Clinic, and did not plan for medically indigent Upshur Street Clinic patients to receive adequate care elsewhere.

B. *Crucial Agency Errors and Incorrect Representations*

64. Defendants cited "estimates" that the Clinic building would need repairs and renovations costing three to five million dollars as a basis for their decision to close the Clinic, and they reported these incorrect estimates to the D.C. Council. All necessary building repairs and renovations could be made at a cost of from one–half to one and one–half million dollars, however.

65. The Court finds that the building does need some repairs to put it in optimum condition. Many of these repairs have been necessitated by the Defendants' failure to sufficiently maintain the building during the past several years. With these repairs and renovations, the existing Clinic building will adequately house health clinic services for the foreseeable future. In its present condition (even without repairs or renovations) the building does not pose a danger to its users or occupants and could continue to be used as a medical clinic.

66. Defendants asserted that the Upshur Street Clinic closing would result in substantial fiscal savings, both in FY '80 and FY '81. However, these assertions, which were challenged in public comment procedures, were incorrect. With respect to the remainder of FY 1980, Defendants initially claimed a savings of $250,000 would accrue from the closing of Upshur Street and two other, smaller public health clinics. On June 27, 1980 (only two months after the Clinic closing) Defendants Epps and Washington, and Dr. Connolly were informed by their administrative officers that no savings at all would accrue in the major cost categories because both security and medical staff were redeployed to other locations. This same point had been raised in comments submitted by Plaintiff Judy Murray on May 18, 1980. Defendants were also informed on June 27, 1980, that the FY '80 savings (from all three clinic closings) would probably only be $45,345, not $250,-000 as claimed earlier.

67. With respect to FY '81, substantial public health fund savings will not accrue from the Clinic closure. To the extent that clinical health services which were formerly offered at Upshur Street are no longer accessible to the medically indigent users of

that Clinic, those users will be forced to seek help at hospitals and emergency rooms when their problems become acute. Hospital and emergency room care of a medically indigent D.C. resident is far more costly than outpatient clinical care, and when it is furnished at D.C. General Hospital the District government pays the bill. In this manner projected fiscal savings from the Upshur Street Clinic closing must be weighed against increases in D.C. General Hospital costs. As more medically indigent patients are shifted to D.C. General Hospital for care, the amount of the Hospital's subsidy from the District must be increased.

68. Moreover, services are being provided less efficiently and economically at the remaining clinics. Upshur Street Clinic, prior to its closing, handled an unusually large volume of patients and provided a large range of services. Defendants, in their own budget documents, acknowledged that the closure of Upshur Street and two other clinics "will impact on the ability of other health facilities to function efficiently." The volume and frequency of doctor visits, per patient, were minimized at Upshur Street Clinic by the integration of services and availability of ancillary or support services and informal consultation among physicians there. In contrast, physician time is wasted due to lack of support staff, insufficient space, absence of ancillary and support services, and lack of physician consultation at the remaining Northwest clinics.

69. Despite the serious impact of the Clinic closing on public health care, Defendants also apparently failed to consider less drastic cost saving alternatives to the Upshur Street Clinic closing. This omission is particularly significant because the "savings" projected from the closing were illusory.

70. Moreover, Defendants failed to consider and request funds for the renovation of this public health clinic which were available from the Department of Health, Education and Welfare. Councilmember Jarvis, who learned in January, 1980, of the funds' availability, informed Defendant Barry and urged him several times to request the funds on the District's behalf. There is no evidence that any of the Defendants made efforts to secure these funds.

71. It is clear that the decision to close the Clinic was premised upon both (1) a dearth of information regarding the effects of closure on the medically indigent, and (2) misinformation about the costs and benefits of closure.

## V. THE COMMENTS OF DISTRICT OF COLUMBIA CITIZENS WERE NOT GIVEN THE CONSIDERATION REQUIRED BY THE D.C. APA

72. On Friday, April 18, 1980, the Defendants published a brief announcement of the proposed closing of Upshur Street Clinic and two other neighborhood clinics in the *District of Columbia Register* (at page 1586). The announcement afforded interested persons thirty days in which to comment, and specifically stated that the closings would not take place in less than thirty days. The notice did not contain a statement of the reasons for the proposed closings.

73. On May 18, 1980, the thirtieth day of the comment period, Plaintiff Judy Murray, a D.C. resident and certified physician assistant at a nearby free clinic, sent Defendant Washington detailed written comments opposing the closing. Ms. Murray's comments raised numerous questions about whether in fact savings would accrue from the closing, about the availability of federal funds to rehabilitate the clinic building, the availability and accessibility of other health resources for the medically indigent, the need for x-ray services, the high disease and infant mortality rates in some neighborhoods served by the clinic, and the apparent lack of planning to assure continuity of care for Upshur Street patients. The comments of several other citizens in opposition to the closing were also forwarded to Defendant Washington during the thirty days following the *Register* announcement.

74. However, none of the comments received in response to the *Register* notice, including those of Judy Murray, were given

consideration. In fact, Defendants admit that the decision to close the clinic may have been made as early as March, and the final date for closure was set on April 22, 1980, before the expiration of the thirty day period. No hearing was held; no notice of the final decision appeared in the *D.C. Register.*

### VI. THE COMMENTS OF ADVISORY NEIGHBORHOOD COMMISSION 4–D WERE NOT GIVEN THE CONSIDERATION REQUIRED BY THE ANC ACT

75. Plaintiff–intervenor Louline Green resides within the boundaries of Advisory Neighborhood Commission (ANC) 4–D, as do many other members of the Plaintiff class.

76. Both before and after receiving official notice of the proposed Upshur Street Clinic closing (on or about April 10, 1980,) ANC 4–D had public meetings in which community residents voiced concern about the closing and requested the ANC to take action. Residents voiced similar concerns in block club meetings and in individual communications with ANC 4–D Commissioners.

77. The Commission of fifteen members voted unanimously to oppose the Clinic closing, and its Chairman, John L. Lanier, Jr., drafted a letter informing Defendant Washington of their opposition. The opposition to closing, as the letter explained, was based upon:

 a. the Commission's belief that the Clinic is vital to health services in its community and in most of Ward 4;

 b. the fact that many citizens need adequate local health care, particularly young adults and senior citizens who depend on the Clinic;

 c. the need to expand, not reduce or terminate, the Clinic's services; and

 d. the belief that given the current medical care and infant mortality crisis, funding for the clinic should be given top priority, even at the expense of other city programs.

The letter was sent April 22, 1980, well within the thirty–day comment period.

78. ANC–4D's comments were not considered prior to the final decision to close the Clinic. Before the 30–day comment period ended and before the ANC–4D comments were received, the Defendants made their decision to close the Clinic. The May 20 date for closure was finalized and targeted on April 22, 1980, the same day on which the ANC's comments were mailed. Neither Chairman Lanier nor any other member of ANC–4D ever received a response from Defendants. Specifically, Defendants failed to draft a written rationale, in accordance with ANC Act requirements, for the decision to close Upshur Street Clinic.

## CONCLUSIONS OF LAW

### I. JURISDICTION

1. Plaintiffs have alleged a non-frivolous claim of deprivation of constitutional rights actionable pursuant to 42 U.S.C. § 1983. The allegations presented thereunder are cognizable in this Court pursuant to 28 U.S.C. § 1343(3). *Examining Board v. Otero,* 426 U.S. 572, 583, 96 S.Ct. 2264, 2272, 49 L.Ed.2d 65 (1976).

2. Plaintiffs have also alleged claims arising under statutes of the District of Columbia. While the doctrine of comity may have justified this Court's abstention from the instant case, Defendants did not assert the application of that doctrine until the commencement of trial. This Court has discretionary jurisdiction over the claims arising under the District of Columbia statutes pursuant to the doctrine of pendent jurisdiction, *Hagans v. Lavine,* 415 U.S. 528, 538–543, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974), and exercises its discretion to assert jurisdiction.

### II. RIGHTS OF THE MEDICALLY INDIGENT IN THE DISTRICT OF COLUMBIA

3. The Clinical Health Services Act of 1977, D.C.Code § 32–322, enacted in the context of a longstanding commitment of the District of Columbia to maintain public health clinics and D.C. General Hospital,

embodies a legislative determination that the District of Columbia provide adequate clinical services to the medically indigent. Subsection (a) of the Act relates to all services, and states that "[n]o person shall be denied clinical services because he or she is unable to pay for such services." Subsection (b) of the Act focuses on clinical services which the legislature determined to be especially important. It provides that the following services "shall be provided by the Mayor in the public interest, without charge, at the District of Columbia health clinics . . . ."

"(1) Screening services
  "(A) Hypertension
  "(B) Sickle cell anemia
"(2) Screening and Treatment Services
  "(A) Drug Addiction
  "(B) Lead poisoning
  "(C) Venereal Disease
  "(D) Tuberculosis outpatient care
  "(E) Forensic psychiatry
"(3) Immunization Services
  "(A) Communicable disease in adults and children
  "(B) Rabies in animals"

Defendants have conceded that the services provided must be adequate if the District of Columbia is to be in compliance with the Clinical Health Services Act.

4. In order to provide health services as required by the Act, the District of Columbia must provide comprehensive treatment for the medically indigent. *Doe v. General Hospital of the District of Columbia*, 313 F.Supp. 1170, 1175 (D.D.C.1970). The Upshur Street Clinic was the only facility in the Northwest quadrant to offer comprehensive care. With its closure, no facility now exists in Northwest Washington that provides comprehensive health care to the medically indigent.

5. Geographic accessibility is imperative if the medically indigent are to receive the medical care they are entitled to under the Act. In order for a facility to be geographically accessible, it must be, according to Defendants estimations, within thirty minutes of the patient's residence by public transportation. The closure of the Upshur Street Clinic deprives its patients of accessible comprehensive health care because many of them would have to travel for periods far greater than thirty minutes in order to receive treatment.

6. Moreover, the remaining clinics in Northwest Washington are unable to provide services to patients who sought health care at the Upshur Street Clinic. Thus, assuming *arguendo* that geographic accessibility exists for certain services, the remaining Northwest clinics cannot meet the demand for treatment created by the closure of the Clinic.

7. Long waits and inadequate or non--existent care await the medically indigent who reside in Northwest Washington because of the closure of the Upshur Street Clinic. This constitutes a constructive and actual deprivation of medical care, in violation of the Clinical Health Services Act.

III. *VIOLATIONS OF THE D.C. ADMINISTRATIVE PROCEDURE ACT*

A. *Arbitrary and Capricious Acts*

8. The District of Columbia Administrative Procedure Act (DCAPA) empowers a reviewing court "to hold unlawful and set aside any action . . . found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." D.C.Code § 1- 1510(3). The scope of review under the DCAPA is the same as that applied under the Federal Administrative Act, 5 U.S.C. § 702. *Coakley v. Police and Firemen's Retirement Relief Bd.*, 370 A.2d 1345 (D.C.1977). This Court is not empowered to substitute its judgment for that of the Defendants; rather, it must determine whether that a rational basis existed for their decision to close the Clinic. *See Citizens to Save Spenser County v. EPA*, 600 F.2d 844 (D.C.Cir.1979); *Ethyl Corp. v. EPA*, 541 F.2d 1 (D.C.Cir.) *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

9. Defendants failed to consider, prior to the closing of the Clinic (1) the role of the Clinic in its health care delivery

# 1106

system, and (2) the impact of the closure on the health care of the medically indigent patients served by the Clinic. Defendants, until the closure of the Clinic, regarded it as "the crux" of their health care delivery system. Their apparent reversal of position is inexplicable in light of the facts presented herein. It is therefore arbitrary and capricious. *See Local 777 v. NLRB,* 603 F.2d 862 (D.C.Cir.1979). Moreover, Defendants failed to compile adequate information or otherwise consider the effects of closure on the medically indigent. In light of the requirements of the Clinical Health Services Act, closing the Upshur Street Clinic without evaluating the effect on the medically indigent was arbitrary and capricious.

10. The record indicates that Defendants decided to close the Clinic for two reasons: (1) that the Clinic building was in need of renovations and repairs estimated at a cost of three to five million dollars, and (2) that closing the Clinic would result in a net savings of District public health funds. The facts presented to the Court do not support either proposition. Defendants' expert testified that the repairs could be performed for $1–$1.5 million dollars; Plaintiffs expert concluded that repairs could be performed for between $500,000 and $1 million. Thus, Defendants' decision to close the Upshur Street Clinic was based on erroneous data concerning the cost of repair. Moreover, the estimated savings of $250,000 has been revised downward to $45,345. Future savings are in serious doubt because (1) the other clinics are less efficiently managed than the Upshur Street Clinic was, and (2) as medical problems accentuate due to the Clinic's closing, patients will be forced to seek care at D.C. General Hospital—at greater cost to the District Government. Since Defendants' decision was premised primarily on erroneous data, it was arbitrary and capricious.

B. *Notice and Comment Procedures*

11. The DCAPA empowers a reviewing Court to "hold unlawful and set aside any action ... found to be (D) without observance of procedure required by law, including any applicable procedure provided by

this subchapter ...." D.C.Code § 1–1510. The DCAPA further provides:

> The Mayor and each independent agency shall, *prior to the adoption of any rule ....,* publish in the *District of Columbia Register* ... notice of the intended action so as to afford interested persons opportunity to submit data and views either orally or in writing .... The publication or service required ... shall be made *not less than thirty days prior to the effective date of the proposed adoption ...,* except as otherwise provided by the Mayor or the agency upon good cause found and published with the notice.

D.C.Code § 1–1505(a).

12. Since the closure of the Upshur Street Clinic was an "implementation of policy," D.C.Code § 1–1502(6), it constituted a "rule" within the meaning of the DCAPA. *See D.C. v. North Washington Neighbors, Inc.,* 367 A.2d 143 (D.C.1976), *cert. denied,* 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977); *Junghans v. Dept. of Human Resources,* 289 A.2d 17, 23 (D.C.1972).

13. The proposed closing of the Clinic was published on April 18, 1980. The finalized decision to close the Clinic was made no later than April 22, 1980, four days after publication. Defendants failed to wait thirty days from publication of notice before taking final action. They also failed to indicate in the notice that they intended to take action in less than thirty days. Thus, Defendants violated D.C.Code § 1–1505(a). *Junghans v. Department of Human Resources,* 289 A.2d at 24.

## IV. *CONSTITUTIONAL VIOLATIONS*

14. As the foregoing Findings indicate, Defendants violated the procedural requirements of the DCAPA and the substantive requirements of the Clinical Health Services Act. This Court need not and should not endeavor to ascertain whether these violations amounted to a denial of due process. *Hagans v. Lavine,* 415 U.S. at 543, 94 S.Ct. at 1382.