Renoldo L. SPIVEY, et al.

v.

Marion BARRY, Jr., as Mayor of the District of Columbia, et al., Appellants,

Louline Green, Intervenor.

No. 80–2511.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 23, 1981.

Decided Sept. 9, 1981.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reischel, Washington, D.C., Deputy Corp. Counsel, were on the brief, for appellants.

Laura W. S. Macklin, Washington, D.C., with whom Marilyn Mohrman-Gillis and Maureen Ward, Washington, D.C., were on the brief, for appellees.

Before WILKEY and MIKVA, Circuit Judges, and GORDON,* Senior United States District Court Judge for the Western District of Kentucky.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This is a class action brought by a class of indigent residents of the District of Columbia (hereinafter denominated "plaintiffs"), requesting declaratory and injunctive relief against the District of Columbia ("D.C."), its Mayor, and other D.C. officials charged with administering public health programs (collectively denominated "defendants"). Plaintiffs alleged that defendants had violated their substantive and procedural rights under D.C. law and the Constitution in the closing of the Northwest Health Clinic, commonly known as the Upshur Street Clinic (or "Clinic").

The district court certified a plaintiff class consisting of "all District of Columbia residents who need, but who are unable to pay for, clinical health services, including but not limited to the health services specified in the District of Columbia Clinical Health Services Act of 1977," *Spivey v. Barry,* 501 F.Supp. 1093, 1095 (D.D.C.1980). Exercising pendent jurisdiction over the claims under D.C. law, the court found that the closing of the Clinic violated substantive rights conferred by the Clinical Health Services Act of 1977, D.C.Code § 32–322 (Supp. V 1978) ("CHSA"),[1] and procedural rights under the District of Columbia Administrative Procedure Act, D.C.Code §§ 1–1501 to 1–1510 (Supp. V 1978 & Supp. VII 1980), and the District of Columbia

Advisory Neighborhood Commissions Act of 1975, D.C.Code §§ 1–171 to 1–171r (Supp. V 1978 & Supp. VII 1980). Having disposed of the case on these local law grounds, the court did not reach plaintiffs' constitutional claims. 501 F.Supp. at 1106.

The district court ordered the defendants to reopen the Upshur Street Clinic "forthwith." *Spivey v. Barry,* Civ. No. 80–1300, Unpublished Order (D.D.C. Nov. 17, 1980). On defendant's motion, this court stayed that order pending appeal. We now vacate that district court order, reaching local issues only to the extent necessary to resolve the present dispute. We conclude that the closing of the Clinic did not violate the CHSA, and that this court accordingly lacks any basis for reordering spending priorities set by the D.C. government. And we conclude that a subsequent budgetary action, which has eliminated any source of funding for the Clinic, precludes us from rendering relief for possible procedural irregularities in the original closing.

## I. BACKGROUND

The factual and procedural background of this appeal involves a complex intertwining of legislative, executive, and judicial proceedings. We begin with the Upshur Street Clinic itself, established in the 1950s as an ambulatory health-care facility for the indigent. For many years it was one of the several free clinics operated by the District of Columbia for persons unable to pay for medical services. By the time of its closing, the Clinic was the largest and most frequently visited outpatient clinic in the District's system of neighborhood facilities. As defendants recognize, it played an integral role in the delivery of health-care services to the medically indigent, defined by the district court as those persons lacking health insurance coverage and unable to pay for private treatment.[2] But the num-

---

\* Sitting by designation pursuant to 28 U.S.C. § 294(c).

1. The CHSA is discussed in Part III(A) *infra.*

2. *See* 501 F.Supp. at 1095. The Upshur Street facility was a comprehensive health clinic, pro-

viding a wide range of medical services to patients covered by Medicaid or Medicare, as well as to the medically indigent. *See* 501 F.Supp. at 1096. The Clinic housed separate venereal disease and tuberculosis clinics, as well as a pharmacy. *See* Memorandum of Albert P. Russo to Marion Barry (Feb. 4, 1980) ("Summary

ber of clients visiting the Upshur Street Clinic had declined in recent years. Its physical condition was poor, and the cost of repair beyond the District's means.[3]

When D.C. Mayor Marion Barry submitted his proposed 1981 budget to the D.C. Council,[4] the portion of the budget allotted to the Department of Human Services ("DHS")[5] included reduced funding for the Ambulatory Health Care Administration ("AHCA"). In particular, that budget contained zero allocations for three clinics: Upshur Street, Parkside, and Arthur Capper.[6]

The Council's Committee on Human Resources and Aging[7] convened public hearings on the proposed Human Resources budget for Fiscal Year 1981 ("FY 1981") on October 11, 15, and 23, 1979. *See* 26 D.C. Reg. 1334 (Sept. 21, 1979); *id.* at 1666 (Oct. 12, 1979). The Committee held discussion and heard testimony concerning the pro-

posed closing.[8] Witnesses for DHS supported the closing for several reasons, including the declining utilization of the clinic in recent years, the close proximity of a modern health facility (the Upper Cardozo Health Clinic) and the lack of the funds necessary to restore the Clinic's decaying physical plant. A number of public witnesses opposed the closing of the three clinics, and several letters of protest were lodged. *See* J.A. at 232 ("History of testimony and other public comment on clinic closings"). A majority of the committee members present voted to approve the budget without restoring funds for the Upshur Street Clinic.

The Committee's report on the DHS budget was presented to the full Council. Councilmember Jarvis, the sole member of the Committee to oppose the Upshur Street closing, spoke out in favor of continued funding. The Council nonetheless accepted the Committee's recommendation, and did

of the Northwest Health Center (Upshur Street Clinic) Closure"), Joint Appendix ("J.A.") at 190–92.

3. The physical plant had deteriorated considerably during the 1970s. *See* Memorandum for the Record (Sept. 2, 1977), J.A. at 251; *id.* at 4, J.A. 254 (building inspection of clinic prompts unanimous recommendation that "existing building should be razed"). Estimates of the cost of renovating the building have ranged from one-half million to five million dollars. *See* 501 F.Supp. at 1102.

4. Although Congress granted to the D.C. government certain legislative powers coextensive with those of the states, *see* D.C.Code § 1–124 (Supp. V 1978), the Home Rule Act did not alter Congress' ultimate legislative authority over the District. *See* D.C.Code §§ 1–126, 1–147 (Supp. V 1978 & Supp. VII 1980). In particular, Congress retained considerable control over the District's fiscal affairs. *See* 31 U.S.C. § 61 (1976 & Supp. III 1979); D.C.Code §§ 1–144(e), 1–147(c), 47–224 (Supp. V 1978 & Supp. VII 1980). The Mayor prepares a detailed budget and submits it to the Council. *Id.* § 47–221. The Council must approve it within 50 days, and may make amendments or supplements after public hearing on the entire budget. *Id.* § 47–224. The Mayor may veto specific budget items, *id.* § 1–144(f), but the Council can override a veto if, within 30 days of the return of the vetoed act to the Council, two-thirds of the Council members present and voting vote to reenact the act, *id.* § 1–144(e). After the Council approves the budget, the Mayor transmits it to the President for approval. *Id.* § 47–224. The President, after reviewing the budget, transmits it to Congress, where subcommittees of both the House and the Senate conduct hearings. The final budget must then be enacted as law by Congress and signed by the President. *See* 31 U.S.C. §§ 2, 11 (1976 & Supp. III 1979).

5. The relevant agency is currently known as the Department of Human Services, and we use that name throughout this opinion to designate both it and its predecessors.

6. *See* 5 District of Columbia Government, Justifications for the FY 1981 Executive Budget, Prepared for the Use of the Congress of the United States 174–75 (January 1980); *id.* at 188–89 ("The Northwest Health Center, the Arthur Capper, and Parkside Clinics will be abolished for FY 1981 and the funds redirected to the remaining clinics to strengthen their funding and services delivery levels."); *id.* at 192–93.

7. The relevant committee has since been renamed, but we use its former designation in this opinion. See the testimony of its Chairperson, Councilmember Polly Shackleton, J.A. at 413.

8. *See id.* at 419.

not include support for the Clinic in the FY 1981 budget.[9]

In presenting the budget to Congress, Mayor Barry addressed the closing of the three public health clinics in his opening statement for the House subcommittee reviewing the appropriations. *District of Columbia Appropriations for 1981: Hearings Before a Subcommittee of the House Committee on Appropriations*, 96th Cong., 2d Sess. 20 (1980) (testimony of March 25, 1980) [hereinafter cited as *House Hearings*]. Councilmember Shackleton also referred to the elimination of funding for the Clinic in her presentations to the congressional subcommittees, both before and after the actual closing. *See id.* at 1637 (testimony of April 22, 1980); *District of Columbia Appropriations for Fiscal Year 1981: Hearings Before a Subcommittee of the Senate Committee on Appropriations*, 96th Cong., 2d Sess. 327, 332 (1980) (testimony of May 29, 1980) [hereinafter cited as *Senate Hearings*]. A citizens' group opposing a wide range of cuts in social welfare programs also submitted testimony protesting the closing. *House Hearings* at 2202 (April 24, 1980). Congress approved the budget, however, without restoring funds for the Upshur Street Clinic; the appropriations bill was passed by the House in September, by the Senate in November, and became law on December 15, 1980. District of Columbia Appropriations Act, Pub.L.No.96–530, 94 Stat. 3121.

Meanwhile, less than three weeks after the House hearings began, the DHS had published notice that the Clinic would be closed before the beginning of FY 1981:[10]

> The Acting Director of the Department of Human Services proposes to close three neighborhood health centers in not less than thirty (30) days from publication of this notice.

The three clinics are Northwest Central Center (1325 Upshur Street, N.W.), Arthur Capper Center . . ., [and] Parkside . . . .

> Persons wishing to comment are requested to do so within 30 days of the date this notice is published in the D.C. Register.

27 D.C.Reg. 1586 (April 18, 1980). Several individuals and groups, including the Advisory Neighborhood Commission ("ANC") for Ward 4, the area of the city primarily served by the Clinic, expressed opposition to the closing. *See* J.A. at 169–71 (letter from Councilmember Jarvis to Mayor Barry); *id.* at 176 (letter from Ward 4 ANC Chairperson Lanier to AHCA Administrator Washington). But before most of the comments were submitted, and well before the 30-day time period for commenting had expired, defendants decided to close the Clinic, choosing May 20, 1980 as the closing date. *See* J.A. at 148 (Memorandum of April 25, 1980, from Anne T. Connolly to AHCA Administrator Washington, entitled "Update on Plan for Clinic Closures").[11] On May 20, the Upshur Street Clinic was closed.

Plaintiffs Renoldo L. Spivey, Iva Johnson, and Judy Murray brought this class action on May 23, 1980,[12] naming as defendants D.C. Mayor Barry, the DHS Director, the Commissioner of Public Health, the AHCA Administrator, the Chief of the DHS Tuberculosis Control Division, and the District of Columbia itself. In their amended complaint, plaintiffs alleged that defendants' closing of the Upshur Street Clinic deprived plaintiffs of their constitutional rights to due process and equal protection, their statutory right to adequate medical care under the CHSA, and related rights under the D.C. APA and the Advisory Neighborhood Commissions Act.

---

9. *See id.*

10. The District of Columbia fiscal year runs from October 1 through September 30 of the succeeding calendar year. D.C.Code § 47–101 (Supp. V 1978).

11. The district court made a finding of fact that the defendants had finalized their decision to close the Clinic on April 22, 1980. *See* 501 F.Supp. at 1104.

12. Louline Green, another former patient of Upshur Street Clinic, was permitted to intervene in the action, supporting the position of the original named plaintiffs. *See* 501 F.Supp. at 1095.

Plaintiffs moved for a temporary restraining order, alleging the immediate and irreparable injury to the plaintiffs' health that defendants' conduct would cause. The court denied this motion. On May 28, 1980, plaintiffs requested a preliminary injunction, citing the same grounds for immediate equitable relief. That motion was argued in part and was eventually consolidated with the trial on the merits. The court permitted the plaintiffs to conduct discovery on an expedited basis because of the danger of irreparable injury to class members unwilling or unable to obtain alternative medical care.

The matter was tried on July 3, 7, and 8, 1980. Defendants requested that the district court abstain from deciding the local law issues, but this request was denied. *See* 501 F.Supp. at 1104. The district court ultimately issued detailed findings of fact and conclusions of law, granting judgment for plaintiffs on November 17, 1980, the same day that the appropriations bill finally passed the Senate. The court found that the closing of the Clinic violated patients' rights under the CHSA, and was arbitrary and capricious within the meaning of § 1–1510(3)(A) of the D.C. APA, and further found that the procedures by which the Clinic was closed violated the Advisory Neighborhood Commissions Act and the notice and comment provisions of § 1–1505(a) of the D.C. APA.

The court ordered defendants to reopen the Upshur Street Clinic forthwith. Defendants then moved to amend the findings and judgment, and to stay the injunction pending appeal. By order issued December 5, 1980, the district court denied the motion for stay, and directed defendants to reopen the Clinic on or before December 19, 1980, "with no less provision of staff or services than existed prior to January 1, 1980." *Spivey v. Barry*, Civ. No. 80–1300, Unpublished Order (D.D.C. Dec. 5, 1980). Defendants appealed from that judgment and mandatory injunction order, and a motions panel of this court stayed the district court's order pending appeal.

## II. EXERCISE OF JURISDICTION

We begin with defendants' challenge to the district court's exercise of federal jurisdiction in this case. The district court predicated subject matter jurisdiction on plaintiffs' claims that closing the Clinic violated their constitutional rights, citing 42 U.S.C. § 1983 (Supp. III 1979) and 28 U.S.C. § 1343 (Supp. III 1979).[13] Defendants insist that these constitutional claims are too insubstantial to support the district court's exercise of pendent jurisdiction over the procedural claims under local law.[14] They also argue that the court's failure to abstain pending submission of the CHSA issue to the local courts was an abuse of discretion.

■ Turning first to pendent jurisdiction, we note that defendants do not deny that

---

**13.** The jurisdictional statute section 1343, since its amendment in 1979, provides in relevant part:

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

. . . .

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; . . . .

(b) For purposes of this section—

(1) the District of Columbia shall be considered to be a State; and

(2) any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

28 U.S.C. § 1343 (Supp. III 1979). *See also* note 21 *infra*.

**14.** The usual federal question jurisdiction of the federal courts under 28 U.S.C. § 1331 is not available in cases arising under the laws of the District of Columbia. Congress has expressly embodied its agreement with this proposition in 28 U.S.C. § 1364 (Supp.III 1979):

For the purposes of this chapter, references to the laws of the United States or Acts of Congress do not include laws applicable exclusively to the District of Columbia.

The district court's decision of the purely local law claims thus involved an exercise of pendent jurisdiction.

the federal and local procedural claims "derive from a common nucleus of operative fact," *see United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). They contend instead that the federal questions raised are too insubstantial to supply the jurisdictional basis for a proper exercise of pendent jurisdiction. The Supreme Court has made clear that a claim is insubstantial for jurisdictional purposes only if "its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy." *Hannis Distilling Co. v. Baltimore,* 216 U.S. 285, 288, 30 S.Ct. 326, 327, 54 L.Ed. 482 (1910), *quoted in Hagans v. Lavine,* 415 U.S. 528, 538, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974).

Defendants insist that the constitutional claims in this case are insubstantial under that very test. Plaintiffs have alleged an entitlement to "adequate" health care under the D.C. Clinical Health Services Act that includes a right to have that health care geographically accessible to them, that is, at the Upshur Street Clinic. Plaintiffs contend that closing the Clinic in May 1980 without affording them a hearing was a violation of the due process clause of the Fifth Amendment.

Defendants regard this procedural due process claim as foreclosed by the Supreme Court's recent decision in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). In that case, the Court held that the aged residents of Town Court had no constitutional right to a hearing of any kind in connection with decertification of that facility by the Department of Health, Education and Welfare ("HEW"). The decertification dispute was between HEW and Town Court, but the facility's disqualification from participating in Medicaid required many patients to transfer to another facili-

ty, inflicting trauma and hardship. Nonetheless, the Court held that the Medicaid program did not confer an entitlement to reside at the facility sufficient to invoke the protections of procedural due process. Defendants argue that the present case is clearly controlled by *O'Bannon,* and that the federal issues were therefore insubstantial.

We cannot agree that *O'Bannon* is controlling here. It is true that the resident patients in *O'Bannon,* like the members of the present class, attached significance to the location of governmentally provided health services. But the Supreme Court did not hold that entitlements based on location in the public health context can never give rise to the right to a hearing under the Fifth Amendment. Rather, the Court held that the Medicaid legislation and regulations did not create the entitlement that the patients claimed—their right to choose their residential facility was limited by the government's ability to decertify providers failing to meet minimum standards of care. *O'Bannon* cannot be dispositive of plaintiffs' alleged right to a certain level of health care availability under District of Columbia law.[15] The federal claim is thus substantial enough to permit exercise of pendent jurisdiction over closely related local law claims.

■ Defendants also urge that the district court should have abstained and required the plaintiffs to submit their construction of the Clinical Health Services Act to the D.C. courts for an authoritative ruling. We note that abstention is required "'only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.'" *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (quoting *County of Allegheny v. Frank Mashuda Co.,* 360

---

**15.** Rather than attempting to enumerate all the significant distinctions between *O'Bannon* and the present case, we merely add the observation that the Second Circuit has held, in *Yaretsky v. Blum,* 629 F.2d 817 (2d Cir. 1980), that transfer of patients to a facility with *inferior* services constituted the reduction of direct benefits, which would invoke constitutional procedural protections, *see* 447 U.S. at 786–87, 100 S.Ct. at 2475–2476.

U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)). This court has never precisely defined the extent to which the policy of allowing state courts to decide unsettled issues of state law applies to that unique jurisdiction, the District of Columbia.[16] As in the past, we assume for present purposes that the abstention doctrine retains its full force with respect to the District of Columbia, but we conclude that the interests served by abstention do not require us to delay further the resolution of this dispute.

Defendants made a belated request for abstention in the district court, citing *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The court appears to have viewed the *Pullman* question as a substantial one, but found its assertion untimely: "While the doctrine of comity may have justified this Court's abstention from the instant case, Defendants did not assert the application of that doctrine until the commencement of trial." 501 F.Supp. at 1104. We think that the facts of this case, viewed from the district court's point of view at the time when the defendants raised the abstention issue, present a difficult question under traditional abstention principles. The district court was aware that plaintiffs offered a novel construction of D.C. law, whose resolution would affect the constitutional claims, and that its grant of relief, however compelling the equities, would constitute significant intervention in the administration of the D.C. health care system. Abstention may have been mandated by the uncertainty of the local law issue, or by the "difficult questions of [local] law bearing on policy problems of substantial public import," *see Colorado River Water Conservation District v. United States*, 424 U.S. at 814, 96 S.Ct. at 1244.

We prefer, however, not to analyze the abstention problem from the district court's perspective. We do not perceive the crucial local law as uncertain, and we suspect that the further prolongation of this litigation would create a greater potential for disruption of local health care policy than the likelihood that the D.C. courts would disagree with our view of local law. We do not believe that a decision to abstain at this late date would serve the purposes that animate the abstention principle, and we decline to order a complete relitigation of this case in the local courts. *See Iowa Independent Bankers v. Board of Governors*, 511 F.2d 1288 (D.C.Cir.1975), *cert. denied*, 423 U.S. 875, 96 S.Ct. 144, 46 L.Ed.2d 106 (1975); Field, *Abstention in Constitutional Cases: The Scope of the Pullman Abstention Doctrine*, 122 U.Pa.L.Rev. 1071, 1108–11 (1974). Accordingly, we will consider plaintiffs' local law claims on the merits to the extent necessary to decide the propriety of the district court's grant of injunctive relief.

## III. PLAINTIFFS' RIGHT TO TREATMENT AT THE CLINIC

Plaintiffs assert that the D.C. Clinical Health Services Act gives them a substantive right to adequate health care, including a right that such care be provided at a site which is geographically accessible. The district court agreed with plaintiffs' interpretation of the CHSA. *See* 501 F.Supp. at 1105. Plaintiffs argue that the closing of

---

**16.** In *Sullivan v. Murphy*, 478 F.2d 938, 962 n.35 (D.C.Cir.), *cert. denied*, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973), Judge Leventhal wrote:

It may well be that the abstention doctrine is rooted in federalism interests which—with all their historic underpinnings, the tension between federal powers and state sovereignty, and the concern for local political autonomy—make the abstention doctrine inapposite in the unique District. It may be that, in defining the relationship between the local and Federal courts within the District, cases articulating the doctrine of abstention in the context of a Federal-state relationship are instructive, but not necessarily controlling. On the other hand it may be that, in enacting the District of Columbia Court Reorganization Act of 1970, Congress intended a relationship between the Federal courts and the local statutory courts to be patterned in full measure on the relationship between Federal and state tribunals in other parts of the country.

*See Campbell v. McGruder*, 580 F.2d 521, 525 (D.C.Cir.1978); *compare United States Jaycees v. Superior Court*, 491 F.Supp. 579 (D.D.C. 1980) *with Halleck v. Berliner*, 427 F.Supp. 1225 (D.D.C.1977).

the Upshur Street Clinic violated their rights under the CHSA, and that the legislative elimination of FY 1981 funding for the Clinic must be discounted because Congress was unlikely to repeal their substantive CHSA entitlement in an appropriations act. *Cf. Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Since the CHSA plays such a crucial role in plaintiffs' theory of this litigation, we address that act first.

### A. *The Clinical Health Services Act*

■ The District of Columbia's Clinical Health Services Act of 1977, set out fully in the margin,[17] is codified at D.C.Code § 32–322 (Supp.V 1978) under the title, "Fees for clinical services for non-indigent persons—Free clinical health services." Subsection (a) gives the Mayor authority to establish rates for fees to be charged at D.C. health clinics, but then goes on to provide that "[n]o person shall be denied clinical services

because he or she is unable to pay for those services." Subsection (b) lists a number of specific clinical services that should be provided without charge in the public interest, while subsections (c) and (d) describe criteria and procedures for addition or deletion of services in subsection (b).

Reading this statutory provision broadly, the district court inferred a legislative intent to require D.C. officials to maintain an "adequate" level of health care for the medically indigent. The court further concluded that "[g]eographic accessibility is imperative if the medically indigent are to receive the medical care they are entitled to under the Act." 501 F.Supp. at 1105. Based on testimony and on various policy determinations by D.C. officials, the district court concluded that the statute embodied an implicit requirement that adequate health care be available "within thirty minutes of the patient's residence by public

---

17. The Act, as currently codified, provides:

§ 32–322. Fees for clinical services for non-indigent persons—Free clinical health services.

(a) A fee, based on rates to be established by the Mayor, shall be charged to persons who are not indigent for all clinical services provided at District of Columbia health clinics, including *the outpatient clinic at District of Columbia General Hospital, except that the Mayor's authority to set such fees at the outpatient clinic at District of Columbia General Hospital shall terminate on the date that the D.C. General Hospital Commission holds its first meeting pursuant to the provision of sections 32–1311 and 32–1316(b).* No fee *for clinical services* shall be charged where so specified by an agreement with the federal government or where the provision of a specified clinical service has been determined to be in the public interest pursuant to subsection (b) of this section. No person shall be denied clinical services because he *or she* is unable to pay *for those services.* The Mayor shall file with the Council of the District of Columbia notice of a proposed rate or a change in a rate at least thirty (*30*) days prior to its effective date.

(b) The following clinical health services shall be provided by the Mayor in the public interest, without charge, at District of Columbia health clinics, including the outpatient clinic at the District of Columbia General Hospital:
(1) Screening Services
(A) Hypertension
(B) Sickle cell anemia

(2) Screening and Treatment Services
(A) Drug addiction
(B) Lead poisoning
(C) Venereal disease
(D) Tuberculosis outpatient care
(E) Forensic psychiatry
(3) Immunization Services
(A) Communicable disease in adults and children
(B) Rabies in animals

(c) The Mayor is hereby authorized to add to or delete from those services specified in subsection (b) such other clinical health services as he determines to be necessary on the basis of any of the following health factors:
(1) threat of communicable disease; or
(2) danger to the public health; or
(3) mortality and morbidity related to specific disease.

(d) At the beginning of each fiscal year, commencing with the fiscal year beginning October 1, 1977, the Mayor shall cause to be published in the District of Columbia Register such additions to or deletions from those services specified in subsection (b) as he may propose. *If no such additions or deletions* are proposed for any given fiscal year, a statement to that effect shall be published in the District of Columbia Register.

Unemphasized language is the language of the original Act, *see* 23 D.C.Reg. 8185–87 (1977); emphasized language was added by the Health Service Rates Act of 1977, *see* 24 D.C.Reg. 913, 916–17 (1977).

transportation." *Id.* Finding that the closing of the Upshur Street Clinic created a sizeable gap in the District's delivery of free health care, the court found that closing the Clinic without a simultaneous upgrading of the available alternative services constituted "a constructive and actual deprivation of medical care, in violation of the Clinical Health Services Act." *Id.*

The CHSA itself contains no reference to thirty-minute travel time, or to a strict concept of geographic accessibility. While the statutory language is highly specific in some other respects, including the initial list of free public services and the timing of changes in that list, the only references to location concern the outpatient clinic at D.C. General Hospital. Plaintiffs have cited no precedent from the D.C. courts construing the CHSA as incorporating the geographic accessibility requirement they propose, nor have they pointed to such a case from any other court.[18]

We turn next to the legislative history of the CHSA, which is comprised solely of an unpublished Report of the Chairperson of the Council Committee on Aging. This report indicates that the purpose of the statute was primarily to codify an existing, unwritten policy of providing health care at the District's health clinics, regardless of a patient's ability to pay.[19] This limited purpose is, of course, consistent with the plain language of the Act.

To carry out the statutory purpose, the DHS maintains a number of public health clinics which render free medical treatment. *See* 501 F.Supp. at 1100–01. Moreover, the DHS has set lofty goals for itself in that regard. Under DHS Reorganization Plan No. 2, the District created the Ambulatory Health Care Administration to "[p]romote a high-quality and cost effective system which emphasize[s] coordinated and comprehensive care to the patient." 501 F.Supp. at 1098. But whatever force these directives might have in shaping the ACHA's policies and practices, we do not believe that their hortatory language expands the statutory rights of indigent patients under the CHSA. Plaintiffs have provided evidence of D.C. officials' preferred policies in health care delivery, but they cite no authoritative administrative interpretation supporting their claim of a right to geographic accessibility directly under the CHSA.

We conclude that, whatever rights D.C. residents have under the CHSA, those rights do not include an entitlement to receive their treatment at a specified location in Northwest Washington. The district court's reliance on this statute as a basis for its injunction was erroneous.[20]

### B. *Equal Protection*

Since the CHSA was the only source from which plaintiffs sought to derive an affirmative obligation to maintain the Upshur Street Clinic,[21] our rejection of their inter-

---

18. The district court cited *Doe v. General Hospital of the District of Columbia*, 313 F.Supp. 1170, 1175 (D.D.C.1970), as support for its conclusion that plaintiffs have a right to adequate health care under the CHSA. *See* 501 F.Supp. at 1105. In *Doe*, the court held that an indigent plaintiff seeking a therapeutic abortion at D.C. General was entitled to have her case processed in accordance with the rules and regulations applicable to such procedures and to be treated according to accepted medical standards in the community. That court's statement that "the Department of Public Health [is] required by law to provide comprehensive medical care for indigent residents of the District of Columbia" is hardly dispositive of plaintiffs' claims under a statute passed seven years later.

19. *See* Memorandum from Councilmember Polly Shackleton to All Councilmembers (Feb. 3, 1977) (memorandum entitled "Bill #2–31, to establish the authority to charge fees for services at District health clinics") (filed as attachment to Plaintiff's Post-trial Brief, Sept. 12, 1980).

20. This conclusion would have an obvious consequence for one of plaintiffs' constitutional claims as well. If the CHSA creates no entitlement, then it provides no basis for finding a procedural due process violation. To that extent *O'Bannon*, like numerous prior cases, *is* controlling.

21. In both the original complaint and the amended complaint, plaintiffs also asserted that the closing of the Clinic violated unspeci-

pretation of that Act makes it necessary for us to reach the claim that closing the Clinic denied its patients the equal protection of the laws. Our consideration of this question is complicated by the fact, noted above, that since the time of the trial in the district court, and indeed since the entry of its orders, the legislative process of hammering out a FY 1981 budget for the beleaguered District has been completed with the passage of the 1981 District of Columbia Appropriation Act.

The legislative history of the appropriation act indicates that the removal of the Clinic's funding was raised before the D.C. Council Committee on Human Resources and Aging, the full D.C. Council, and both congressional subcommittees. Attempts to save the Upshur Street Clinic were unsuccessful: the Council and Congress ratified the elimination of funding rather than reinstating appropriations for the Clinic. Thus, the decision to leave the Clinic closed after September 30, 1980,[22] was not merely an administrative or executive action by defendants. It was the implementation of a legislative act, precipitated by a need to reduce expenditures of public funds by DHS. *Senate Hearings* at 327–38 (testimony of Polly Shackleton).

Plaintiffs insist that this budgetary action cannot affect their rights under the CHSA because repeal by implication is disfavored particularly in construing appropriations acts. But we have concluded that the CHSA does not confer the substantive right that plaintiffs allege. Their only remaining substantive objection to the closing of the Clinic for FY 1981, therefore, is the constitutional claim based on the equal protection principle embodied in the due process clause of the Fifth Amendment.

■ The Supreme Court has long cautioned that the Constitution does not empower the judiciary "to second-guess [government] officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). While our judgment may be informed by a sensitivity to the plight of the poor, we cannot reorder the District's fiscal priorities to provide better health care for its citizens. This court lacks the expertise to duplicate the District's labors in trying to stretch an insufficient budget to meet all its needs, and the Constitution has assigned that task to another body. The Supreme Court has recently had occasion to reiterate the limits of judicial review of congressional distribution of benefits among different categories of the medically needy:

> Unless a statute employs a classification that is inherently invidious or that impinges on fundamental rights, areas in which the judiciary then has a duty to intervene in the democratic process, this Court properly exercises only a limited review power over Congress, the appropriate representative body through which the public makes democratic choices among alternative solutions to social and economic problems.

*Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981).

■ Plaintiffs do not assert that the action they challenge was motivated by an invidious purpose, or that it infringes a fundamental right. They do not even assert that it constitutes discrimination against the poor; rather, it is at most a discrimination *among* the poor, having a different impact on the residents of different areas within the District. Plaintiffs

fied duties under portions of 42 U.S.C. §§ 300k to 300n–5 (1976 & Supp.III 1979). This argument was never pressed, however, and alleged federal statutory obligations are not mentioned in plaintiffs' Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order (May 23, 1980), Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction (May 28,

1980), Memorandum of Points and Authorities in Support of Motion for an Order Certifying Class (May 28, 1980), or Proposed Findings of Fact and Conclusions of Law (Sept. 12, 1980). We deem plaintiffs to have abandoned this claim.

**22.** *See* note 10 *supra.*

claim that this action is arbitrary and irrational because it lacks any rational relationship to a legitimate government purpose.

We find that the legislative decision to close the Clinic easily meets the deferential standard of review that a court must apply. The closing changes geographic distribution of health care services in the District, but courts have "never found in the Equal Protection Clause any *per se* rule of 'territorial uniformity.'" *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 54 n.110, 93 S.Ct. 1278, 1307 n.110, 36 L.Ed.2d 16 (1973). And the legitimate purpose motivating the action is readily apparent: accommodation of the health care needs of D.C. residents with the District's continuing fiscal crisis.

■ Plaintiffs agree that the purpose behind the closing was legitimate, but they contend "that closing this particular clinic was an irrational, arbitrary and capricious, and wholly ineffectual means of achieving that objective." Brief of Appellees at 29. The defendants had concluded that the Clinic building required massive repairs, and that smaller clinics in the general vicinity could provide the same services more efficiently and economically. Plaintiffs sought to prove in the district court that these estimates were totally wrong. *See* 501 F.Supp. at 1102. But however persuasive such a showing may be in cases asserting arbitrary action under an Administrative Procedure Act,[23] it can rarely suffice to make out an equal protection violation. As the Supreme Court has recently repeated,

> [a]lthough parties challenging legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational, *United States v. Carolene Products Co.*, 304 U.S. 144, 153–154,

58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938), they cannot prevail so long as "it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable." *Id.*, at 154, 58 S.Ct. at 784. Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken.

*State of Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981) (footnote omitted). Plaintiffs' evidence that the closing may fail as an economy measure does not rob that action of all rationality. We conclude, therefore, that the closing of the Clinic, as of September 30, 1980,[24] was a permissible legislative policy choice that does not deny patients the equal protection of the laws.

The significance of this finding for the present litigation goes far beyond the determination that one count of plaintiffs' complaint lacks merit. The legislative decision to deny funding for the Clinic in FY 1981 constricts severely the range of remedial options open to a court reviewing the compliance of earlier executive actions with local law. This court has no power to grant plaintiffs the relief that constituted the overriding objective of this litigation: the reopening of the Clinic. Only the D.C. Council and Congress can take such action now.

## IV. THE REMAINING CLAIMS

Properly concerned to avoid unnecessary constitutional adjudication, the district court analyzed the May 1980 closing as a matter of local administrative law, and detected several defects in defendants' ac-

---

**23.** We note that the district court did find the May 1980 closing, to the extent that it was an executive act, to be arbitrary and capricious under the D.C. APA. As discussed in Part IV *infra*, we conclude that this question is now moot.

**24.** Similarly, the early closing of the Clinic in May 1980 as an executive act involved no equal protection violation. The reasons asserted to

justify that action are the same as those proffered in defense of the legislative decision. Administrators' findings as to legislative facts also bear a strong presumption of rationality in equal protection analysis. *See, e.g., Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976); *Bynes v. Toll*, 512 F.2d 252, 257 (2d Cir. 1975).

tions. This approach may have been correct in May or July of 1980, but the completion of the legislative process has pushed these issues onto the periphery of the litigation in its present state. After a brief discussion of the district court's holdings, we conclude that adjudication of the local administrative issues is inappropriate now that no effective relief can be given, and we vacate the district court's judgment on these issues.

Plaintiffs asserted two violations of the D.C. Administrative Procedure Act. First, they claimed that the decision to close the Clinic was arbitrary and capricious within the meaning of D.C.Code § 1–1510(3)(A) (Supp.V 1978), which is similar to the judicial review provisions of the federal APA. This claim was based on the same empirical argument that constituted plaintiffs' irrationality claim under the Fifth Amendment. Second, they alleged that the decision was made without allowing the statutory notice and comment period to run its course, and without compliance with the special provisions for emergency rulemaking, in violation of D.C.Code § 1–1505(a) (Supp.V 1978). The district court held in favor of the plaintiffs on both of these counts.

Plaintiffs also argued that defendants violated the Advisory Neighborhood Commissions Act, D.C.Code § 1–171 to 1–171r (Supp.V 1978 & Supp.VII 1980). That Act requires the D.C. Mayor, Council, and other agencies to give thirty days' written notice to the neighborhood commissions before adopting, inter alia, "proposed changes in District government service delivery," id. § 1–171i(c)(1). The neighborhood commissions' recommendations are to "be given great weight during the deliberations by the governmental agency and those issues shall be discussed in the written rationale for the governmental decision taken." Id.

§ 1–171i(d). The district court made factual findings that the decision to close the Clinic was made before the thirty-day period had passed, that the Ward 4 neighborhood commission's recommendations were given no consideration at all, and that they were never addressed in any written rationale. 501 F.Supp. at 1104. While these findings of fact were never repeated as a conclusion of law, the district court's opinion makes it clear that the court considered these failings to constitute a violation of the Advisory Neighborhood Commissions Act.

 Turning first to the substantive review under the D.C. Administrative Procedure Act, we have no difficulty in concluding that this issue is moot.[25] Given that the Clinic was to be closed in any event at the beginning of FY 1981 when its funding expired, the reviewable executive action is the decision to terminate its operations before the end of the 1980 fiscal year. That question is now moot: no court can require defendants to implement a sounder interim policy once the interim period has ended.[26] Nor does this case come within the familiar exception to the mootness doctrine for government actions "capable of repetition, yet evading review," see Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Plaintiffs' substantive APA challenge, like their equal protection claim, depends on a showing that the defendants erred factually in concluding that closing the Clinic would achieve needed economies and improve the District's ability to provide health services within its limited resources. A legal controversy so sharply focused on a unique factual context does not present "a reasonable expectation that the same complaining party would be subjected to the same ac-

---

**25.** We therefore have no occasion to decide whether, as defendants argue, the district court erred in construing the D.C. APA to allow substantive review of their decision under the arbitrary-and-capricious standard of § 1–1510(3)(A) despite the fact that the defendants were not adjudicating a "contested case," see Dupont Circle Citizen Ass'n v. D.C. Zoning Comm'n, 343 A.2d 296 (D.C.1975).

**26.** It is irrelevant whether the case became moot before or after the district court's orders, since mootness can supervene while the case is on appeal, see, e.g., DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (per curiam).

tions again," see *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975); *cf. Montgomery Environmental Coalition v. Costle*, 646 F.2d 568, 583–84 (D.C.Cir.1980) (substantial evidence challenge to expired permit is moot).

 We are inclined to suspect that the district court was correct in finding violations of the notice and comment requirements of the D.C. APA and the consultation provisions of the Advisory Neighborhood Commissions Act. But, while we do not wish to condone deliberate flouting of D.C. law by D.C. officials, we would prefer not to muddy the waters of local administrative law by unnecessarily deciding issues in a case where we can fashion no adequate remedy.[27] Injunctive relief is now out of the question, and plaintiffs have never asserted a right to damages in this case. And finally, we conclude that a grant of declaratory relief would not achieve any useful objective in this case. Issuing a declaratory judgment is an act of equitable discretion, which should reflect a careful balancing of opposing interests:

> Perhaps the best general guide for the courts is the Supreme Court's instruction in *Eccles v. Peoples Bank*, . . . that the discretion is to be "exercised in the public interest" and in such a way as "to strike a proper balance between the needs of the plaintiff and the consequences of giving the desired relief." Also quoted with some frequency is Professor Borchard's "general rule that the declaration is an instrument of practical relief and will not be issued where it does not serve a useful purpose." . . . Finally, this court has placed some emphasis on the likelihood that a controversy—particularly one of questionable vitality—will recur.

*Hanes Corp. v. Millard*, 531 F.2d 585, 591–92 (D.C.Cir.1976) (citations omitted). Plaintiffs' primary goal, the reopening of the Clinic, is now impossible, and the public value of a theoretical inquiry into the extent of defendants' past departures from local procedural norms is outweighed by the possible detriment flowing from a federal court's unnecessary intervention into the structure of D.C. government. Where so little benefit is likely to result, courts have normally withheld declaratory relief. See, e.g., *Hanes Corp. v. Millard*, 531 F.2d at 595 (refusing declaration on statute of limitations defense against expired patent); *Baldwin Metals Co. v. Donovan*, 642 F.2d 768 (5th Cir. 1981) (refusing declaration on invalidity of warrant for search that has already occurred); *McCorkle v. United States*, 559 F.2d 1258 (4th Cir. 1977, cert. denied, 434 U.S. 1011, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978) (refusing declaration on repealed statute where inseparability would preclude damage award even if challenged portion invalid); *Workman v. Mitchell*, 502 F.2d 1201 (9th Cir. 1974) (refusing declaration concerning severity of punishment during prison strike unlikely to recur).

Thus, we conclude that the resolution of the central issue in this case, the legality of the permanent closing of the Clinic as a legislative act, renders unnecessary the adjudication of the remaining local law issues. Rather than remanding the case to the district court for an exploration of noninjunctive forms of relief, we hold that the case should be dismissed.

## V. CONCLUSION

Judicial review of the legislature's distribution of public welfare benefits among needy recipients is necessarily limited. Where litigants allege only that a government program is irrational because empirical evidence suggests that it is not efficacious, their showing must be strong indeed before a court would be empowered to agree. This is not one of those exceedingly rare cases in which such a claim can prevail.

---

**27.** Since we hold that equitable relief would be inappropriate in any event, we need not decide whether in the present context plaintiffs' claim, that a public service has been withdrawn in advance of its legitimate termination date without observation of procedural requirements, has become moot, or whether instead it is preserved by the "capable of repetition, yet evading review" doctrine or for some other reason. The same would be true of any procedural claims under the due process clause of the Fifth Amendment.

We conclude that plaintiffs' substantive claims to a right to receive medical treatment at the Upshur Street Clinic, under the Clinical Health Services Act or under the Fifth Amendment, are meritless. The district court erred in basing its injunction on a continuing duty to operate the Clinic under the CHSA.

The other local law claims include a substantive claim under the APA, which is moot, and local procedural claims that do not provide a sufficient basis for equitable relief on the facts of this case. Accordingly, it is unnecessary to reach the merits of those local claims. The judgment of the district court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*